[Civ. No. 8134. First Appellate District, Division Two.—January 18, 1933.]

JOINT HIGHWAY DISTRICT No. 9, Appellant, v. OCEAN SHORE RAILROAD COMPANY (a Corporation) et al., Respondents.

Donald C. Young, Mary Schwab, Henry Heidelberg and John R. Golden for Appellant.

John J. OToole, City Attorney (San Francisco), Erwin P. Werner, City Attorney (Los Angeles), Frederick von Schrader, Assistant City Attorney, and Arthur W. Nordstrom and Arthur Loveland, Deputies City Attorney, as *Amici Curiae* on Behalf of Appellant.

Keyes & Erskine, Henry E. Monroe, Ross & Ross and J. Benton Tulley for Respondents.

SPENCE, J.—This is a proceeding in eminent domain. Upon a trial by the court sitting without a jury plaintiff had judgment against defendants Ocean Shore Railroad Company and McNee, condemning a right of way for highway purposes over the property of said defendants. In its findings the trial court determined that the "fair market value" of the property of the defendant Ocean Shore Railroad Company was $95,000 and that the "fair market value" of the property of defendant McNee Company was $17,000, and entered its judgment accordingly. From this judgment plaintiff appeals.

As the entire controversy on this appeal involves the evidence and findings relating to the market value of the property condemned, it is appropriate that said property be briefly described. It consists of a strip of land 60 to 100 feet in width and approximately five miles in length, located in San Mateo County near the Pacific Ocean. This is a continuous strip, except for a small gap in the center which is of no concern on this appeal, extending from a point north of Pedro Point to a point to the south thereof. It is a part of the right of way which was used for railroad purposes until 1920 by the Ocean Shore Railroad, and a large portion of the property is located about 200 feet above the water on the steep bluffs overlooking the Pacific Ocean. It had been graded for the use of the Ocean Shore Railroad and was suitable for use for either railroad or highway purposes.

Pedro Point, above referred to, is on the shore line at the end of a spur which runs in a westerly direction to the sea from a range of hills. This range of hills stretches southerly from the southwestern part of San Francisco to a point near the town of Boulder Creek, in the Santa Cruz Mountains, practically paralleling the shore line of the ocean for most of that distance. These hills rise to a considerable height, being approximately 2,500 feet above sea level at a point between Pescadero and Redwood City. There are heavily wooded watersheds on the westerly slopes of these hills where Pescadero, Butano and Gasez Creeks run

down through fertile valleys to the ocean. Owing to the existence of this range of hills and the spur running to Pedro Point, it is practically impossible at the present time to enter the territory on the ocean side of the range and south of the spur from the territory on the north or east thereof without climbing over either the range or the spur. In order to afford transportation facilities into this territory the Ocean Shore Railroad Company many years ago acquired the strip around Pedro Point and made improvements on this right of way which need not be described in detail. Suffice it to say that the grading project, in making a shelf around the precipitous cliffs near Pedro Point, was a difficult one, involving the removal of 1,600,000 cubic yards of material, almost one-half of which was solid rock. For financial or other reasons the Ocean Shore Railroad was not built beyond Tunitas, but trains were run to that point for several years. The operation of the road was abandoned by the company in 1920 and its financial difficulties are now a matter of history. The rolling stock was sold and the tracks and ties were removed. All that remained was the roadbed, a portion of which is still owned by the company and is the subject of this litigation, together with that portion of the roadbed running across the McNee property. It is not disputed that the property here involved constitutes the only practical railway gateway into the territory referred to above and that the grading thereon constitutes ninety-five per cent of the work necessary to complete a roadbed for either a railroad or a highway. Various estimates were given of the reproduction cost less depreciation, the lowest of which estimates was well in excess of $600,000.

Upon the trial the parties asserted their respective claims regarding the market value of this property. Experts were called and the estimates of those produced by plaintiff were widely at variance with the estimates of those produced by defendants. Appellant's witnesses saw no value in this strip of land other than its value as bare land located where "it was too steep to even raise goats", and they therefore found it to have only a nominal market value. They admittedly did not take into consideration its availability for railroad or highway purposes. On the other hand, respondents' witnesses did take into consideration the availability of the property for transportation purposes, and their

estimates of the market value ran from $250,000 to sums in excess of $500,000. To the testimony of all of these witnesses for respondents, counsel for appellant entered repeated objections. Practically all of these objections were overruled and it was agreed that the testimony was admitted subject to a motion to strike. Such motion was thereafter made by appellant to "strike out all of that testimony of the witnesses, Archibald Baker, H. G. Butler, P. L. Burr, William James Ford, Harry G. Burrows, Hussey, Sutton, Middleton and Crosby, Lane and Wood". This motion was made upon the ground "that the testimony here introduced has not been testimony which showed *market value,* the testimony simply showing the *value* of the highest available use." (Italics ours.) There were other grounds stated for striking the testimony of certain witnesses, but as they are not urged on this appeal we will not discuss them. The motion to strike was taken under submission with the cause upon its merits, but no ruling upon the motion appears in the record. A memorandum opinion was filed by the trial court at the time of announcing its decision and thereafter the findings and judgment were entered as above indicated.

■ Before proceeding to a discussion of the merits of the appeal we may state that a review of the record shows that there was ample evidence to support the trial court's findings regarding the market value of the property. This is apparently conceded, but appellant contends that the "testimony of defendants' witnesses was incompetent" and that appellant's objections should have been sustained and appellant's motion to strike should have been granted. Although appellant devotes a great deal of space to attacking certain statements of the trial court in its memorandum opinion, we shall proceed to a consideration of the above contentions which are directed to those matters which are properly before us and which, we believe, are determinative of this appeal.

As appellant's motion to strike was directed at all of the testimony of all of respondents' witnesses who had testified as to market value, we should first inquire as to whether there was any competent evidence given by any of said witnesses on this subject. Our examination of the record convinces us that there was much of the testimony on this

subject which was competent and was properly admitted by the trial court. The qualifications of these witnesses are not disputed. They were highly trained men, most of whom had devoted many years of their lives to engineering work, with particular reference to railroad construction, maintenance and valuation. In the opening brief counsel for appellant concedes that "they were all high-class experts" and we will not pause to state their respective qualifications. We further deem it unnecessary to set forth all of the voluminous testimony given by said witnesses, as counsel for appellant does not do so, being content with stating that "the testimony of one was the testimony of all, with certain variations unnecessary to notice." Counsel, however, then proceeds to cull from the record those portions of the testimony which are deemed most objectionable, dwelling chiefly upon the testimony of the witness Baker.

We will quote but a few examples of the testimony introduced which in our opinion was entirely competent. Mr. Butler, a man of wide experience, was asked: "Q. Now, having in mind your examination of the ground and of the records, and your experience as an engineer, and valuation of the properties and grading, and so forth, can you state what, in your opinion, is the market value of this land and of the improvements thereon? . . . A. In my opinion the Ocean Shore section has a market value of $500,000.00 and the McNee section $60,000.00." The following is found in the examination of Mr. Ford: "Mr. Erskine. Q. Will you give the value your statement—will you state then what you consider to be the value of—the market value of these two pieces? Mr. Heidelberg. For what purpose? Mr. Erskine. For any purpose for which they may be adapted. Mr. Heidelberg. That is all right, I have no objection to that question. A. The Ocean Shore part, $532,620.00. Mr. Erskine. Q. And for the McNee? A. $79,000.00 for the lower end." On the examination of Mr. Burrows there was considerable argument by counsel as to the form of the questions relating to market value. We will not set forth the questions and answers propounded on direct examination, for on cross-examination the witness was asked the question of market value in the precise form insisted upon by counsel for appellant, as follows: "Mr. Heidelberg. I am asking you, Mr. Burrows, what would be the fair

market value of the Ocean Shore property and the McNee property, from an owner willing to sell to a buyer willing to buy, in terms of money, a reasonable time being allowed to consummate the sale, having knowledge of all of its available uses and purposes? . . . A. I believe that the market value of the Ocean Shore property, with the railroad work on it, is $420,000.00, and that the value of the McNee property, with the railroad work on it, is $57,700.00.'' Other evidence of a similar nature is found in the testimony of other witnesses. If such testimony was not based upon improper considerations the trial court properly denied the motion to strike as to the testimony hereinabove set forth and any similar testimony. Practically all of these witnesses for respondents freely conceded either that they did not know the value of the property for purposes other than transportation purposes or that they considered its value for other purposes purely nominal.

It is apparent from what has been said that the property involved in this litigation was far better adapted for use for railroad or highway purposes than for any other purpose and that its value in use for such purposes was far greater than its value in use for any other purpose. Its use for such purposes was, therefore, what has been termed its ''highest available use''. Under these circumstances the trial court was confronted with the problem of determining the proper amount of compensation to be awarded to the owners of the property taken.

The authorities covering the determination of the market value and the competency of testimony in such cases are numerous. Many of the leading cases on the subject are reviewed in *City of Stockton* v. *Ellingwood,* 96 Cal. App. 708 [275 Pac. 228], and *Sacramento etc. R. R. Co.* v. *Heilbron,* 156 Cal. 408 [104 Pac. 979]. It is difficult to reconcile the various decisions and the language employed, for even where the cases are in substantial accord on the definition of market value they are found to be at variance on the rules relating to the competency of evidence to prove the ultimate fact as thus defined. It is conceded by appellant that ''there is some comfort in the language of the Ellingwood opinion for respondents' contentions''. We would go further, for we believe that the authorities, including the decision as well as the language of the opinion in the case

of *City of Stockton* v. *Ellingwood, supra,* sustain the admissibility of ample competent evidence in the present case to support the findings and judgment.

We do not propose to exhaustively review the numerous authorities cited by counsel in the present case. Many of these authorities have been treated at length in the decisions referred to above. But before considering more specifically some of appellant's contentions we desire to make certain general observations regarding the numerous decisions on the subject before us.

In our opinion the difficulty encountered in reconciling the various decisions and the language used by the various courts is due in part to the fact that the word "value" is frequently used but it is often impossible to determine the sense in which that word is employed. Sections 1248 and 1249 of the Code of Civil Procedure use the terms "value" and "actual value". It has long been recognized that the word "value" may be used in different senses. In Nichols on Eminent Domain, second edition, volume 1, page 661, it is said: "The conception that property has a market value distinct from its value for particular uses is an ancient one. It is referred to by Aristotle, and was recognized in colonial times, being then called 'the rule of common estimation'." In *San Diego Land etc. Co.* v. *Neale,* 78 Cal. 63 [20 Pac. 372, 3 L. R. A. 83], the court said at page 67: "The word 'value' is used in different senses. Bouvier, in his definition, says: 'This term has two different meanings. It sometimes expresses the utility of an object and sometimes the power of purchasing goods with it. The first may be called the value in use, the latter the value in exchange.' For the purposes of the law of eminent domain, however, the term has reference to the value in exchange, or market value." Also, in Black's Law Dictionary we find the following: "Value. The utility of an object in satisfying, directly or indirectly, the needs or desires of human beings, called by economists 'value in use'; or its worth consisting in the power of purchasing other objects called 'value in exchange'." The distinction between value in use and value in exchange or market value has been generally recognized by the courts and it is well settled that it is the market value which governs in proceedings in eminent domain and not the value in use to either the owner or con-

demnor. (*Sacramento R. R. Co.* v. *Heilbron, supra; Central Pac. R. Co.* v. *Feldman,* 152 Cal. 303 [92 Pac. 849]; *Santa Ana* v. *Harlin,* 99 Cal. 538 [34 Pac. 224]; *Spring Valley W. W.* v. *Drinkhouse,* 92 Cal. 531 [28 Pac. 681]; *San Diego Land etc. Co.* v. *Neale,* 88 Cal. 50 [25 Pac. 977, 11 L. R. A. 604]; *San Diego Land etc. Co.* v. *Neale, supra; City of Stockton* v. *Ellingwood, supra;* 10 Cal. Jur. 338; Lewis on Eminent Domain, 3d ed., vol. 2, p. 1227 et seq.; Nichols on Eminent Domain, 2d ed., vol. 1, p. 658 et seq.) But, while generally recognizing this distinction, the courts have frequently used the word "value" without any clear indication of whether it is used in a particular expression to indicate value in use or market value. Furthermore, we believe that the term "market value" has sometimes been employed in the sense of value in use.

By way of example we find the following language used *in City of Stockton* v. *Ellingwood, supra,* at pages 715 and 716: "If the lands sought to be condemned are peculiarly valuable for reservoir purposes, we think the following is a correct statement of the law as applied to the pending actions: What the land is worth in the market for reservoir purposes, not what it is worth to the condemnor for reservoir purposes, is the major factor to be considered by the court in making its award of damages. . . . While the qualifications of the witnesses may be inquired into with considerable minuteness upon direct examination, it does not appear that testimony as to the value of lands for any special purpose may be given by the witness in dollars and cents. The witness may be questioned as to every adaptability that would give value, but his opinion must not be expressed in the general terms of so much money as the market value." The words "market value" appearing at the end of the foregoing quotation must necessarily have been used by the court in the sense of value in use for a particular purpose, for the very subject upon which witnesses are permitted to give their opinions in dollars and cents is the market value of the land. It is a dollars and cents estimate of the value in use for a given purpose which is not permitted, at least on direct examination.

We believe it perfectly clear that certain land may be of but small value in use for one purpose and of much greater value in use for another purpose. It may therefore be said

to have a different value for one purpose than for another if the word value be understood as meaning its value in use. But a given piece of land has only one market value and not a certain market value for one purpose and a different market value for another purpose. ■ This is true because by what has been termed the classic definition, "market value" is fixed as the "highest price estimated in terms of money which the land would bring if exposed for sale in the open market with reasonable time allowed in which to find a purchaser, buying with knowledge of all of the uses and purposes to which it was adapted and for which it was capable". (*Sacramento R. R. Co.* v. *Heilbron, supra,* p. 409.) This market value may be greater or less than the value in use to either the owner or the condemnor, but in the eyes of the law it is a fixed amount determined by "the highest sum which the property is worth to persons generally, purchasing in the open market in consideration of the land's adaptability for any proven use". (*Sacramento R. R. Co.* v. *Heilbron, supra,* p. 412.)

■ We further believe that the definition of market value first above quoted and often found in the decisions has itself brought about some confusion. It apparently contemplates the highest price which "*a* purchaser" will pay. This would seem to fix market value by the necessities or whims of a single purchaser rather than by the "highest sum which the property is worth to persons generally". It frequently happens that a condemnor is willing to pay almost any price for a given piece of land, strategically located, rather than forego a contemplated project, but it is well settled by the authorities, above cited, that advantage may not be taken of the necessities of the condemnor. In other words, the price which a single prospective purchaser might be willing to pay does not establish market value, which market value must be determined, in the last analysis, by the "rule of common estimation".

The determination of market value is sometimes a simple matter, but is frequently most difficult. There is little difference of opinion, ordinarily, regarding the market value of certain securities and certain articles of commerce for which there is an active demand resulting in daily sales. When, however, an attempt is made to fix the market value of real property some little difficulty is encountered even

when the property is located in a populous center where the sales of somewhat similar property are frequently made. The difficulty is even greater when the real property is located in a less populous area where there is little active demand and sales are less frequently made. When, as here, such property is located in an isolated area and is improved so as to make it peculiarly adaptable to a particular use and when there have been no sales at any time in that vicinity of similar property with like improvements, the problem of determining market value becomes a most perplexing one. In such cases it has been said that ''there is no market value, in the strict sense of the word'', as there is no ''general demand'' (*City of Stockton* v. *Ellingwood, supra,* p. 734), but in our opinion, with the possible exception of certain types of real property which, by reason of the peculiar nature of improvements actually in use thereon, have been said to be not marketable (Nichols on Eminent Domain, 2d ed., vol. 1, p. 677), the test is always the market value of the land.

With the foregoing observations in mind we shall proceed to analyze more specifically some of the contentions found in appellant's brief, disregarding those which are merely directed at the trial court's statements in its memorandum opinion. This is somewhat difficult, as the headings found in the opening brief are practically all directed to the statements found in the memorandum opinion while the headings in the reply brief are not only entirely different in form, but are somewhat different in substance.

■ Appellant contends that ''marketability must be shown before availability can be considered'' and that ''testimony on market value for a particular purpose cannot be given unless and until a market therefor has been proved''. The main thought behind these contentions is, in the words of appellant, that ''a market is essential to a market value''. With this last statement we can readily agree. It goes without saying that a demand is essential to create a market value, but in our opinion such demand may be either an active or a potential demand. Appellant seems to consider that there can be no market value unless there is an active demand, but such a rule would frequently result in depriving the owner of his property without awarding him just compensation. The mere fact that there is no one who

is ready, willing and able to purchase the property at the time in question does not mean that the property has no market value. In Nichols on Eminent Domain, second edition, volume 1, at page 661, it is said: "Market value is, essentially, based on assumption, not on fact. To establish market value it is not necessary to point out any designated person who is able and willing to buy the property at the price alleged, or at any price, . . . " ■ While it may be entirely proper on cross-examination to elicit facts to show that there is little or no active demand for the property, such testimony would not necessarily indicate the total absence of a potential demand therefor; and while the weight to be given to the testimony of witnesses on market value may be affected by the fact that they have not sufficiently considered the nature and extent of the demand, we believe that opinions on market value may be given by qualified experts based entirely upon a potential demand where the evidence tends to show a reasonable probability that purchasers for the property may be found within a reasonable time. In passing we may state that a "reasonable time" in cases like the present one is far greater than in cases involving ordinary land. (*City of Stockton* v. *Ellingwood, supra,* p. 714.)

■ Counsel for appellant attempts to belittle the effect of the testimony introduced by respondents for the purpose of showing a demand for the land for transportation purposes. This testimony did fall short of showing that there was anyone ready, willing and able to purchase the land for such purposes, but, as above indicated, such showing was unnecessary. The testimony introduced showed that a group consisting of the witness Chamberlain and his associates had been working for many years upon a proposed railroad project over this route; that they had expended vast sums of money making surveys, obtaining options and procuring advice on the engineering, financial and legal phases of their proposed project; that they had purchased an option on the property here involved, but their plans had been interrupted by litigation between the respondent Ocean Shore Railroad Company and the Spring Valley Water Company over another portion of the right of way; that when a decision was obtained in that litigation favorable to said respondent, said option was renewed and was actually

in existence and the parties were still negotiating at the time that this proceeding was commenced. The testimony further showed that one of respondents' witnesses had contemplated a toll-road project over this right of way but had finally given up this idea when the then members of the board of supervisors of San Mateo County had indicated that they did not favor such a project. In addition to the foregoing testimony, experts, who were familiar with the strategic location of the property and its availability for transportation purposes, and who had studied the topography and resources and the territory to be served, testified that in their opinion the conditions would justify and would make practical and feasible either a railroad or a toll-road project over this route. Regardless of any actual dealings with prospective purchasers this last-mentioned testimony constituted some evidence of a potential demand for the property for transportation purposes. Such evidence was strengthened by the showing that certain individuals had been actually working on plans for a railroad project and had procured an option upon the property in question. In view of all of the evidence mentioned above the trial court could properly conclude that there was a reasonable probability of finding purchasers for the property for transportation purposes within a reasonable time. In other words, we believe that there was ample evidence to show a potential demand for the property for transportation purposes and that "marketability" for such purposes was thus established.

It does not follow from what has been said that the "value in use" for transportation purposes would be the "market value" of the property. The value in use for such purposes would be but one factor in determining the market value. The nature and extent of the demand, active or potential, for the property for transportation purposes would be at least an equally important factor in such determination. Where the demand is potential rather than active the honest opinions of well-qualified experts will differ greatly, as the problem of weighing the factor of demand with the other factors to be considered becomes a most difficult one. In such cases the widest latitude should be permitted in the cross-examination of the experts in order to test their opinions. But where it appears to the

trial court or jury that there is a potential rather than an active demand for the property for its highest available use, then the opinions of those experts who either entirely ignore the effect of such potential demand upon the market value or, on the other hand, treat such potential demand as affecting the market value to the same extent as an active demand, should be weighed accordingly.

Appellant further attacks the competency of respondents' evidence on market value upon the theory that such testimony was merely of "market value in itemized terms of money for the property's highest available use". We have above indicated that in our opinion property has but one market value, and not a certain market value for one particular use and a different market value for another use. If, under the established rules, a witness is shown to have sufficient qualifications to give an opinion on market value he may do so even though he knows nothing of the value in use of the property for uses other than its highest available use. As was said in *City of Stockton* v. *Ellingwood, supra,* at page 716: "If a witness, by reason of his skill, learning or technical training, understands the adaptability of the lands in question for a particular purpose, and the demand for land for such purpose, he may state the market value of the land, although he may be entirely unacquainted with the other elements which would be considered by different buyers competing for the same property." We believe that if we may properly speak of the *market* value of the land for its highest available use, such *market* value must necessarily be the same as the market value of the land.

Appellant further states that the market value "cannot be based on cost of reproduction, plus appreciation, less depreciation". There is some conflict of authority on the question of the admissibility of evidence to show such cost of reproduction, but we believe that when it appears that property is improved so as to make it peculiarly adaptable for its highest available use and there may be said to be a market for the property for such use, the cost of reproduction of such improvements becomes a factor in the determination of market value and to that extent the opinions of the witnesses may "be based on" such cost. This does not mean, however, that such cost of reproduction is the

760

market value of the land, for other factors, including demand, enter into the ultimate determination of market value.

 Appellant further contends that "testimony of strategic value for transportation uses cannot be given, because appellant had no competitor therefor". Here again appellant assumes that there was no demand for the land for transportation purposes other than the demand created by appellant. We have heretofore pointed out that there was sufficient evidence to show a potential demand and therefore potential competition for the property for such purposes and it cannot be said that appellant had no competitor. The situation here is not analogous to the one presented in *Gilmer* v. *Lime Point,* 19 Cal. 47, cited by appellant. The owner there attempted to prove the "value of the premises as a site for a fortification". Such evidence was held inadmissible "because there was no market for the land for such purposes, competition being essential to a market and the government being of necessity without a competitor in purchases of land for purposes of fortifications". Whenever there is potential competition for land for a particular use, its strategic location and the nature of the improvements thereon, if any, may be considered in determining its availability for such use and are factors in determining the market value. (*Mississippi & R. R. Boom Co.* v. *Patterson,* 98 U. S. 403 [25 L. Ed. 206]; Lewis on Eminent Domain, 3d ed., sec. 707; 20 C. J., p. 776 et seq.) Appellant's contention may seem to imply that testimony of "strategic value" was given in dollars and cents, but we find no such testimony in the record. Respondents' witnesses merely gave testimony regarding the strategic location of the land and further testimony regarding improvements, in order to show its availability for use for transportation purposes, and said witnesses properly considered these elements in arriving at their opinions on market value.

 A further contention made by appellant is that the "necessity of condemnation of many miles of lands owned by others negatives availability of this strip of land for railroad purposes". In support of this contention appellant cites and relies mainly upon *City of New York* v. *Sage,* 239 U. S. 57 [36 Sup. Ct. Rep. 25, 60 L. Ed. 143], and

*City of Stockton* v. *Vote,* 76 Cal. App. 369 [244 Pac. 609].
A careful reading of these decisions shows that this broad
proposition stated by appellant cannot be sustained. These
and other authorities on the subject are discussed in *City
of Stockton* v. *Ellingwood, supra,* at page 726 and following,
where the court reached a conclusion contrary to that con-
tended for by appellant. The necessity of acquiring a
right of way for railroad purposes over other lands might
affect the market value of the strip in question, but it
cannot be said that it absolutely ''negatives availability of
this strip of land for railroad purposes'' unless the im-
practicability of uniting the several parcels of land appears
from the record. (*City of Stockton* v. *Ellingwood, supra,*
p. 733.)

Appellant attempted to show such impracticability.
An effort was made to show that it was necessary, because
of the topography of the country, to obtain a right of way
through what is known as Sharp Park. Assuming that
such necessity was shown, appellant now contends that ''no
right of way could be secured through Sharp Park, without
which the strip of land was utterly valueless and useless
for railroad purposes''. It is unnecessary to deal with the
other question embraced in this contention, for in our opin-
ion appellant's claim that ''no right of way could be secured
through Sharp Park'' cannot be sustained. That property,
comprising a large tract of land, was conveyed to the city
and county of San Francisco in 1917 in trust for park
purposes with a reversionary clause applicable in the event
that it was used for other purposes. At that time the Ocean
Shore Railroad Company was actually operating its rail-
road line across said property and continued to so operate
for several years thereafter. Furthermore, there were two
public roads running across the land and the grant to the
city and county of San Francisco for park purposes was
made subject to the previous grants of rights of way for
said public roads. The right of way previously used by
the railroad company was within a few feet of one of these
roads and practically paralleled the road across the property.
As a railroad line was in actual operation across the prop-
erty at the time of the grant for park purposes appellant's
contention that a grant of a right of way would be incon-
sistent with the use of the property for park purposes can-

not be sustained. Those claiming under the reversionary clause could not successfully assert such claim. Appellant cites and relies upon *Hall* v. *Fairchild-Gilmore-Wilton Co.*, 66 Cal. App. 615 [227 Pac. 649], but the facts in that case readily distinguish it from the facts before us in the present case. In any event it was unnecessary to obtain a right of way for railroad purposes over that portion of the land granted for park purposes, for such railroad could have been run over the portion of the property previously granted for highway purposes as contemplated by subdivision 5 of section 465 of the Civil Code.

Appellant further contends that "the value, if any, of the stone quarry should be disregarded". While evidence of the value of the stone quarry was admitted, it does not appear that this evidence was considered by the trial court in fixing the market value of the property. In fact, the memorandum opinion filed by the trial court and set forth by appellant in its brief affirmatively shows that this evidence was disregarded by the court. Under these circumstances there is no showing that the error, if any, in admitting this evidence was prejudicial.

Appellant further contends that "no view of the premises was taken by the trial judge, and therefore there is no basis for the compromise judgment". In this connection it is argued that as the trial judge did not view the premises and did not accept the testimony of either the witnesses for appellant or respondent in fixing the market value, the judgment is "totally unsupported by any evidence". We find no merit in this contention. The trial court is not bound by the opinions of the witnesses on market value, and the province of such testimony is only to aid the court in arriving at a conclusion. (10 Cal. Jur. 972.) There is usually a sharp conflict in the evidence relating to market value in condemnation proceedings. The estimates given by the witnesses for the owners are ordinarily found to be in excess of the estimates given by the witnesses for the condemnor. In such cases the trial court, after weighing all of the evidence, frequently fixes the market value at a sum between the varying estimates of the witnesses for the respective parties. This was done in *City of Stockton* v. *Ellingwood, supra*. On page 718 of the opinion the court points out that the trial court fixed

the market value at an average of $80 per acre "although the witnesses for respondent gave their opinion of value as $100 per acre, and the witnesses for the appellant at an average of about $25 per acre". On pages 742 and 743 of the opinion attention is called to the fact that the trial court was not bound by the testimony of the expert witnesses and that it was the province of the trial court to determine the weight to be given to such testimony. There, as here, the trial court no doubt believed that, in estimating the market value of the land, respondents' witnesses had not sufficiently considered the necessity of and the time and expense involved in combining the land with other lands in order to make the property fully available for its highest use. In the instant case the trial court no doubt reviewed all of the evidence and further believed that respondents' witnesses had given too much consideration to the reproduction cost of the improvements and too little consideration to the fact that the demand for the land for transportation purposes was more in the nature of a potential demand than an active demand. On the other hand, the trial court probably believed that the testimony of appellant's witnesses was entitled to but little weight, as they had entirely ignored the existence of any demand for the land for transportation purposes and the availability of the land for such purposes. The trial court was not obliged to blindly accept the estimate of any witness on market value, and properly made its own determination of the ultimate fact, aided by the testimony of the various witnesses weighed in the light of all of the evidence before the court. There was ample evidence to support the findings and judgment, and the fact that the trial court did not view the premises and did not fix the market value at a figure testified to by any witness is entirely immaterial.

In the reply brief appellant states the contention that "testimony evaluating remote, conjectural, speculative and hypothetical uses is inadmissible". If we correctly understand this contention we can readily agree that such testimony would be inadmissible. We might go further, for under the law of this state it is not proper on direct examination to give in terms of money the value in use of property for any purpose whatever. But we believe that if there is a demand for the property for a given purpose

it is entirely proper for a witness to give consideration to its value in use for such purpose as one of the factors in determining its market value. If, on the other hand, the possibility of the use of the land for a given purpose is so remote, conjectural and speculative as to have no effect upon the minds of purchasers generally, its value in use for such purpose cannot then be a factor in determining its market value. We find no testimony in the record ''evaluating'' remote, conjectural or speculative uses. We have above indicated that in our opinion there was ample evidence of a potential demand for the property for transportation purposes, and the testimony of respondents' witnesses was not inadmissible merely because said witnesses gave consideration to the value in use of such property for such purposes as a factor in arriving at their determination of market value. The evidence did more than show a mere remote, conjectural or speculative possibility that the property would be used for transportation purposes. It was sufficient to show that there was a reasonable probability of finding purchasers for the property for transportation purposes within a reasonable time.

In reviewing the voluminous record in the present case we do find testimony which in our opinion should have been stricken out. For example, the testimony of the witness Baker, upon which appellant dwells at length, affirmatively shows that said witness had no proper conception of the factors to be considered in determining market value. In giving his opinion on the market value of the property of the Ocean Shore Railroad Company this witness testified on direct examination: ''I presume the market value would be the cost of reproduction. . . . My conclusion as to market value is it would be in the neighborhood of $620,000, it would cost in the neighborhood of that to reproduce that work, and anything, whether highway or railroad, that went in there would have to do that amount of work to get the thing into the shape that it is today. Q. Is that your conclusion then as to what the market value of it is? A. Yes, it is. Q. Now, what is your statement in the same respect regarding the McNee tract? A. That it would cost $169,000. Q. And that is your idea of what you consider to be the market value of that tract of land to anybody who wanted to use it? A. It is what it would cost them

to reproduce it." This and other testimony of the witness showed that he believed that the term "market value" was synonymous with the term "cost of reproduction". Similar criticism can be made of the testimony of one or more of the remaining witnesses for respondents, but it cannot be applied to all of respondents' witnesses. We may refer to the testimony of the witness Butler, who considered the cost of reproduction but arrived at a market value far below such cost of reproduction. It was entirely proper under the circumstances for said witness to give consideration to such cost as a factor in determining market value. Further, we believe the testimony of the witness Wood purporting to represent market value should have been stricken. This witness would not concede that the "possibility of sale" had any relation to market value and his opinion purports to be no more than his estimate of the value in use of the property for transportation purposes.

It may therefore be freely conceded that the above-mentioned evidence and other evidence in the record should have been stricken, but it does not necessarily follow that the action of the trial court in admitting such evidence and thereafter failing to strike the same constituted prejudicial error requiring a reversal. In *City of Stockton* v. *Ellingwood, supra,* at page 742, the court quotes from *City of Ely* v. *Conan,* 91 Minn. 127 [97 N. W. 737], as follows: "Ordinarily the admission or exclusion of opinion evidence, where it is not of a determinative character, is not regarded as sufficient to justify a reversal." This is more particularly true where, as in the present case, the cause was tried by the court sitting without a jury and it does not appear that the trial court's determination of market value was in any way influenced by the testimony erroneously admitted. While the objectionable testimony contained figures in excess of the highest estimates found in the competent testimony on market value, the trial court fixed the awards at figures far below the lowest estimates of market value found in any of the testimony, competent or incompetent, offered by respondents. It is quite apparent that the trial court made its own determination of the market value of the land, using the opinions on this subject merely as an aid for that purpose and giving to such opinions only the weight to which they appeared to be entitled. This was entirely

proper and we find no prejudicial error in the admission of the incompetent testimony referred to or in the refusal to strike out said testimony.

Counsel for appellant have cited two recent decisions, namely, *Temescal Water Co.* v. *Marvin,* 121 Cal. App. 512 [9 Pac. (2d) 335], and *City of Los Angeles* v. *Deacon,* 119 Cal. App. 491 [7 Pac. (2d) 378], in which the decision in *City of Stockton* v. *Ellingwood, supra,* is discussed. We find nothing in the decisions mentioned in conflict with the views herein expressed.

 Our attention is called to the fact that the testimony discussed in the opinion in *City of Stockton* v. *Ellingwood, supra,* was testimony elicited upon cross-examination rather than upon direct examination. Counsel for appellant then makes the statement that unless the decision in that case sustains the rulings of the trial court in the present case a reversal must follow. We cannot accept this view of the situation. Here several qualified witnesses produced by respondents gave competent testimony on *market value* on direct examination. The fact that some of respondents' witnesses may have been permitted to give other testimony on direct examination, which testimony should have been permitted only on cross-examination, is not sufficient ground upon which to predicate a motion to strike all of the testimony of all of said witnesses. We are unable to see where any error found in the record has resulted in any prejudice to appellant. We believe that our conclusion in this regard is to some extent shared by counsel for appellant, for in the concluding portion of the reply brief it is stated: "The trial court correctly interpreted the law in refusing to consider estimates based on duplication costs, and being controlled entirely by what the land would bring in the open market for all purposes including railroad purposes." 

We may further state that much of the alleged objectionable testimony of these witnesses had to do with the strategic location of the land and the nature of the improvements thereon, tending to show its availability for transportation purposes. Under the circumstances in the present case we believe that such testimony was proper on direct examination. We have found no authority presenting facts on all-fours with those before us, but the facts found in *North Shore R. Co.* v. *Pennsylvania Co.,* 251 Pa. 445 [96 Atl. 990],

are somewhat similar. The decision in that case supports the view that testimony of the character referred to is admissible. Appellant insists that such testimony was inadmissible, but this argument, like many others advanced by appellant in the briefs, is based upon the premise that there was no market for the property for transportation purposes. This argument falls, for, as pointed out above, there was sufficient evidence to establish the marketability of the land for such purposes.

In conclusion we may state that with appellant's several contentions in mind we have carefully reviewed the entire record, including the evidence. The problem presented to the trial court of fixing the fair market value of the land was an exceedingly difficult one. We can conceive of no state of facts under which the honest opinions of experts on market value could differ more widely. The trial court appears to have considered all of the factors which might be properly considered in determining market value and to have fixed the ''just compensation'' accordingly. Our review of the entire record convinces us that no error is to be found which was prejudicial to appellant or which has resulted in a miscarriage of justice.

The judgment is affirmed.

Nourse, P. J., and Sturtevant, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on March 17, 1933.

Shenk, J., dissented.