[Civ. No. 22978. Second Dist., Div. Two. June 18, 1958.]

THE PEOPLE ex rel. DEPARTMENT OF PUBLIC WORKS, Appellant, v. KENJI MURATA et al., Respondents.

George C. Hadley, Hugh R. Williams, Richard G. Rypinski and Charles E. Spencer, Jr., for Appellant.

Hodge L. Dolle and J. Marion Wright for Respondents.

HERNDON, J.—This condemnation case went to the jury on June 17, 1957, just four days before the Supreme Court filed its opinion in *County of Los Angeles* v. *Faus*, 48 Cal.2d 672 [312 P.2d 680]. The state appeals from the judgment on the verdict awarding defendants a total of $610,763 for nine parcels of real property totaling approximately 53 acres. The property was taken for the Harbor Freeway right of way. The date of valuation was January 4, 1956. At that time the land was being used for agricultural purposes. Apparently there was substantial agreement that the highest and best use to which most of the land was adaptable was for residential subdivision. However, defendants point to evidence that the staff of the County Regional Planning Commission had recommended a change of zone to permit commercial uses with respect to certain portions of the property fronting on Florence Avenue. Defendants contended that these portions would be adaptable to commercial development.

The state's first assignment of error is based on the refusal of the trial court to give substantially the same cautionary instructions (relative to prices paid by governmental agencies in purchases of other properties) the refusal of which was held to be reversible error in *County of Los Angeles* v. *Faus*, *supra*, 48 Cal.2d 672, 675-676. We have concluded that the application of the law as enunciated in the Faus decision requires a reversal of the judgment at bar. This conclusion is fortified by the presence in the record of other prejudicial errors hereinafter discussed.

In the instant case, none of the expert witnesses professed to rely upon purchase prices paid by governmental agencies for any specific parcels of property in arriving at their opinions as to the value of the subject property. However, counsel for defendants, in cross-examining one of the state's experts, brought to the attention of the jury the amount which the state had paid for an adjacent parcel of land referred to as the "Stoll" property. The Stoll property was needed for the same freeway project, and, indeed, at the time it was purchased was one of the several parcels under condemnation in the instant action.

The following testimony was given by the state's valuation expert Baker under cross-examination, after he had identified a Mr. Thomason as an appraiser for the state: "Q. So when you exchanged ideas and information and data with Mr. Thomason, Mr. Thomason undoubtedly told you two appraisers

that he had in 1955 for the State of California Division of Highways appraised the Stoll property which is the two orange groves just next to the Murata property, didn't he? A. Yes, I understood he made an appraisal of that property. Q. He told you he appraised it for approximately $15,000.00 an acre in 1955? A. It may be overall; it varied. Q. Yes. A. Overall the piece north and—the piece north of Florence. Q. Overall, $15,000.00? A. I think that is approximately right, but I am not—I don't have his appraisal here. Q. *Did you learn that the State of California paid in excess of $15,000.00, the Division of Highways paid in excess of $15,000.00 an acre for Mr. Stoll's, for the property just next to the Murata property?* MR. HADLEY: Just a moment. To which we object as incompetent, irrelevant and immaterial, and not a proper test of the knowledge and credibility of this witness. It is merely an attempt to get in the price paid for the other land by the State of California. There is nothing in the question to show that there is a degree of comparability, and if it is to be a proper test of the knowledge and credibility of the witness, he should ask the witness preliminarily whether or not the Stoll property is comparable to the property here under consideration. MR. DOLLE: It is proper under the City of Los Angeles——THE COURT: Objection overruled. Q. BY MR. DOLLE: You knew that, didn't you? A. *I knew generally the price paid by the State for the Stoll property,* yes. Q. All right. Now, you said you talked to Mr. Stoll. Do you recall testifying to that yesterday? A. Yes. . . . I did testify to that. Q. *Do you wish to testify that Mr. Stoll felt that the appraisal and price paid was the fair market value of the property?* MR. HADLEY: Just a moment. That is incompetent, irrelevant, immaterial, and argumentative. MR. DOLLE: He talked to Mr. Stoll and he so testified. MR. HADLEY: Let's have the question. THE COURT: Read the question. (The reporter read the question.) MR. DOLLE: I will reframe the question. Q. Mr. Stoll you identified yesterday as being connected with the Tillman & Reeder Real Estate office in the immediate area, didn't you? A. That is right. Q. You talked to Mr. Stoll, didn't you? A. Yes, I talked with him. Q. In this conversation, in talking with Mr. Stoll, *did you seek to learn whether or not Mr. Stoll felt that the price that the State of California paid and Mr. L. D. Thomason's appraisal on his property was the fair market value of it?* MR. HADLEY: That is objected to as being incompetent, irrelevant and immaterial. THE COURT: *Overruled.* THE WITNESS: No, I

didn't make any investigation of how he felt about it. I was in that office for information on sales listings and the use of the property but Mr. Stoll—*I didn't question Mr. Stoll on it, but he didn't volunteer they were unhappy or make any complaint about it.*"

Subsequently, in the cross-examination of the same witness, counsel for defendants elicited the following testimony with reference to the acquisition of 12.64 acres of land by the school district referred to as the "Paddison School site": "Q. You found that the school——how many acres did you find? A. 12.64 acres. Q. You found that they paid $10,000.00 an acre for that land? A. No, my information is they acquired it in the latter part of 1954 for $9,710.00 per acre. Q. The latter part of 1954 for how much an acre? A. $9,710.00 per acre. . . . Q. *Did you find on that Paddison property then from your investigation that the school had taken an option on the property earlier, the Paddison property, at a lower price and had held off for a while, then had later sought to enforce the option but were unable to do so at the lower price because of the increase in values, and had to pay almost twice as much as they had the option for?* MR. HADLEY: Just a minute, Mr. Baker. That is based upon the assumption of facts which counsel is assuming is a fact for the purpose of asking the question. It is not proper cross examination. THE COURT: If this witness knows. MR. HADLEY: It is the same type of question——*I would like to have the further objection to any and all sales with respect to sales that are between private individuals and public agencies as not representing the market value, Your Honor, and we would request at this time in advance of any jury instructions at the conclusion of the case that the purpose of this line of examination is to test the knowledge and credibility of the witness, and that any sale which is referred to which involves an agency of the Government which has the power of eminent domain is not a fair criterion of the value.* MR. WRIGHT: Your Honor,—— THE COURT: *I will instruct the jury at the proper time in these matters.* MR. DOLLE: Your Honor, may I point out to the court—— THE COURT: Proceed with your question, counsel. MR. HADLEY: My objection may go to this? THE COURT: *Overruled.*"

It was later developed that the price of $9,710 per acre paid by the school district was actually paid pursuant to a judgment in a condemnation action. The matter of the school district acquisition terminated with the following colloquy

between court and counsel: "MR. DOLLE: The witness said the price paid was $9,710. That is where I got the price. I didn't know anything about the judgment. He used the information some way or another. THE COURT: Actually there wasn't a purchase then? MR. HADLEY: That is right. MR. DOLLE: Under the City of Los Angeles v. Cole I am permitted on cross examination to inquire into acquisition by a public agency, particularly so when the witness under direct examination said he considered them. MR. HADLEY: Well, now, he didn't consider it. He said that he investigated and found——the consideration of his sales are expressed in 23 sales upon Plaintiff's Exhibit 16." Counsel for appellant correctly states that the record does *not* indicate that the witness had relied upon these particular transactions in arriving at the opinions expressed by him on direct examination.

During their arguments addressed to the trial judge with reference to the propriety of these questions concerning prices paid by the governmental agencies for other acquisitions, counsel on both sides made repeated references to the decision in *City of Los Angeles* v. *Cole*, 28 Cal.2d 509 [170 P.2d 928]. ■ The cautionary instructions requested by the state and refused by the trial court were as follows:

"You are instructed that the purchase price paid by any agency of the government, including a school board, is not a proper basis for determining the market value of the property here in question. Such sales are not a fair criterion of value for the reason that they are in the nature of a compromise. The fear of the one party or the other to take the risk of legal proceedings ordinarily results in the one party's paying more or the other party's taking less than is considered to be the fair market value of the property. For these reasons such sales are not proper evidence of value in any case, whether in a proceeding by the same condemning party or otherwise."

"What the State of California has paid for other property is not competent evidence of market value. Such sales are not a fair criterion of value, for the reason that they are in the nature of a compromise. They are affected by the element which does not enter into similar transactions made in the ordinary course of business. The fear of one party or the other to take the risk of legal proceedings may result in the one party paying more, or the other taking less, than is considered to be the fair market value of the property. For these reasons such sales are not competent evidence of value,

whether in a proceeding by the State of California or other-wise. You are, therefore, instructed that if any witness has been questioned concerning such sales, such questions were permitted only for the purpose of testing the fairness or hon-esty of the opinion given by such witness as to the market value. You are not to consider such testimony for the pur-pose of arriving at the actual market value of the subject property, but only for the purpose of determining the weight and credibility to be given by you to the testimony of such witness in relation to the market value of said property.''

It will be observed that the foregoing requested instructions were essentially the same in substance as those involved in *City of Los Angeles* v. *Cole, supra,* 28 Cal.2d 509, and *County of Los Angeles* v. *Faus, supra,* 48 Cal.2d 672.

It is our view that refusal of these instructions was serious error under the decisional law prevailing at the time of trial and therefore that there should be a reversal in this case for the same basic reason that the judgment in the Faus case was reversed, that is to say, ''so that the parties herein may try the issue of value according to the [new] rule . . . [therein] adopted.'' (48 Cal.2d at p. 676.) Paraphrasing the language of the last paragraph of the Faus decision, at page 681, as it would apply to the case at bar: ''It is apparent that this law-suit was tried by the trial judge and the attorneys for both parties under rules of law which are now repudiated. The new and presently effective rules will be available to both parties upon a retrial.''

Under the new rules enunciated in Faus, ''evidence of the prices paid for similar property in the vicinity, including prices paid by the condemner'' is held admissible as evidence of value. However, we interpret the Faus decision as holding also that a ''wide discretion'' must be granted the trial judge in determining the admissibility of evidence of other sales; that the laying of appropriate foundations should be required to keep the admission of such evidence ''within safeguarding limits'' and that evidence of the price paid by a condemner should be admitted as evidence of value only after the trial judge has been satisfied ''that the price paid was sufficiently voluntary to be a reasonable index of value.'' The foregoing interpretation of Faus is based upon the language quoted with approval from McCormick on Evidence (1954), section 166, page 348, as set forth in the opinion at pages 678 and 679.

It is very doubtful, to say the least, that the trial judge in the exercise of the ''wide discretion'' allowed him in

applying the standards of admissibility prescribed by the Faus decision could have held admissible as evidence of fair market value the prices paid by the state for the Stoll property and by the school district for the Paddison School site. If evidence concerning these acquisitions, and the prices paid therefor, conceivably might have been held admissible, either on direct or cross-examination, for any legitimate purpose within the limits prescribed by Faus, it surely would have been incumbent upon the trial court to give appropriate instructions to advise the jury as to the purpose for which the evidence might properly be considered. Appropriate instructions to guide the jury in the application and evaluation of expert testimony are no less essential under the new rules than they were under the old.

Under the law as it was understood prior to the Faus decision, instructions of the nature here requested and refused would clearly have been necessary. Justice Spence, in his dissenting opinion in Faus, refers to the decision in *City of Los Angeles* v. *Cole,* 28 Cal.2d 509 [170 P.2d 928], and to circumstances there involved, as follows:

"In the Cole case, the property involved was in an area which had been designated for a civic center, and much of the property required for that purpose had been acquired or was being acquired. Many condemnation proceedings had been commenced. In other words, all property was being acquired under condemnation or the immediate threat of condemnation. The condemner was, in reality, buying under compulsion and the sellers were selling under compulsion. Under these circumstances and 'in the light of the evidence adduced,' we held in the Cole case that it was proper to instruct the jury that '*the price paid by plaintiff condemner* for other property is not a proper basis for determining the market value of the property here in question', and that 'the price fixed by an agreement between the owner of property and *a public corporation seeking to condemn* his land by virtue of eminent domain cannot be taken as a criterion of the market value of other land in the vicinity.' " (48 Cal.2d at page 682.)

Respondents, in an effort to distinguish the Cole and Faus cases from the case at bar, point out that the valuation witnesses for the owners in the Cole case and for the county in the Faus case considered and largely relied upon acquisitions by public agencies having the power to condemn in arriving at their opinions as to market value, whereas *respondents'* expert witnesses expressly refrained from predicating their

opinions as to market value on sales to entities possessing the power of eminent domain.

We believe, however, that it would be most unrealistic to assume that the jury was uninfluenced by the testimony elicited by respondents in their cross-examination of the state's witness concerning the prices paid by the state and by the school district for the neighboring properties. The prejudice to the state resulting from the inquiries into the circumstances of the Stoll acquisition was aggravated by the fact that defendants were permitted, over plaintiff's objection, to show that the state had paid an amount in excess of its own appraisal figure to acquire the property. The state quite apparently was under the necessity of acquiring the Stoll property, either by purchase or by condemnation in the pending action. It was buying the property under compulsion. In other words, the purchase of the Stoll property amounted to a compromise settlement of the pending action as to that parcel.

Manifestly it was respondents' deliberate purpose to impress the jury with the idea that the price paid by the state for the adjoining Stoll property was representative of the fair market value of land very similar to the subject property. This is made unmistakably clear by counsel's questions propounded to the witness Baker asking whether the witness had learned *"that Mr. Stoll felt that the appraisal and price paid was the fair market value of the property."* The purpose and probable effect of this line of inquiry is self-evident.

We turn now to the state's contention that the trial court erred in refusing to admit into evidence certain photographs portraying the subject property in a flooded condition. The state offered these photographs to prove the seriousness of the drainage problem affecting the property and its value for residential purposes.

It was the state's contention that before the land could be used for subdivision purposes it would be necessary to solve the drainage problem by making adequate provision for the disposal of waters naturally flowing onto the property from higher lands to the north, and also the waters originating within its own boundaries. It was the defendants' position that the drainage difficulties could be remedied with only a relatively small outlay. Consequently, a very considerable part of the testimony related to the hydrography of the property and to the frequency and the extent of the flooding conditions.

It appears that during the winter and spring of 1952-1953

the Murata property had been subjected to rather serious flooding due in part to the diversion of drainage waters from certain new subdivisions which had been completed upon lands lying to the north. The Muratas brought suit against the county, the state, and the subdividers seeking an injunction designed to prevent the future discharge of these waters upon the Murata land. Prior to trial, the state and county were dismissed from this suit and the case afterwards assumed the aspect of an action for damages. The case came on for trial in 1954 and the Muratas recovered a substantial award of damages from the subdividers of the land to the north to compensate for the detriment to the Murata property resulting from the flood hazard caused by the activities of the defendant subdividers.

In the 1954 trial of the damage action, the Muratas introduced into evidence a number of photographs showing the flooded condition of their property as it had appeared at certain times during the winter and spring of 1952-1953. The purpose, of course, was to prove the extent of the flood damage to which the property had been subjected. At the trial of the instant case the state offered to introduce the same photographs after first laying the foundation that nothing had been done to alter any of the essential conditions affecting the drainage problem. The trial court sustained defendants' objections to these offers apparently on the theory that their admission would present the danger of ''getting off into collateral matters.''

We hold that the rulings rejecting the photographs were prejudicially erroneous. Admittedly there had been no substantial change in the conditions to which the prior flooding was attributed. The photographs clearly illustrated the potential danger to which the land was subject, and, therefore, were relevant to the issue of value. Respondents' sole answer to this assignment of error is that the photographs were merely cumulative evidence of conditions which were thoroughly and adequately described by oral testimony. This answer is insufficient and especially so in the light of the fact that the court received in evidence photographs offered by defendants which showed little or no indication of flooding after heavy rainstorms in 1956.

The state next complains that the trial court erred in unduly restricting its cross-examination of the defendants' expert witness Frisbie. It appears that Mr. Frisbie testified as an expert witness for the Muratas in the 1954 trial of their

above mentioned action to recover damages for the flooding of their property. To establish the elements of damage in the prior action, Frisbie testified to his opinion as to the value of the subject property both before and after the creation of the conditions to which the flooding was attributed.

In the trial of the instant action, Frisbie testified that as of January 4, 1956, the Muratas' property was worth from $10,000 to $43,560 per acre, or a total of $889,330. On cross-examination, counsel for the state propounded the following question to Mr. Frisbie: "Q. Now, Mr. Frisbie, you had in mind then that in 1953 you valued this property, all of the property owned by the Muratas, regardless of the separateness of ownership between the family from parcel to parcel, but considering it all part of one large holding and before any damage occurred, you evaluated that holding, the entire holding, at the fair market sum of $250,000.00?" After defendants' objection was overruled, the witness answered the quoted question in the affirmative. In response to further questions, Frisbie testified that to his knowledge no measures had been taken to protect the property from the conditions giving rise to the permanent damage concerning which he had testified in 1954.

Thereupon counsel for the state informed the court of his intention further to cross-examine Frisbie concerning his 1954 testimony. Counsel declared in substance that if permitted he would show that Frisbie had testified in the 1954 trial that as of the spring of 1953 the market value of a 15-acre parcel of the subject property was $1,500 per acre, whereas in the instant trial, he placed the 1956 value of the same 15 acres at figures ranging from a low of $10,000 to a high of $43,500 per acre on various portions thereof. Counsel further offered to show that Frisbie's 1953 valuation of the remaining 35 acres was $4,650 per acre.

The court sustained defendants' objection to this proposed line of cross-examination, declaring: "You are going to get into collateral matters which can be extremely serious here. I am confident you have gone as far as you can. At least I don't feel it is proper for you to go any further."

We conclude that this ruling operated unduly to restrict the cross-examination. ■ It is well settled that "[t]he value of the opinion evidence of a witness may be tested by showing that upon a former occasion he expressed a different opinion, or made statements inconsistent with the opinion expressed." (27 Cal.Jur. 155, § 128; 70 C.J. 1053, § 1239; 98 C.J.S. 555, § 581; *San Diego Land Co.* v. *Neale*, 88 Cal.

50, 67 [25 P. 977, 11 L.R.A. 604] ; *People* v. *Donovan,* 43 Cal. 162, 165-166.) It is the almost universal rule "[t]hat *expert opinions,* as well as other opinions ordinarily admissible, if inconsistent with those expressed on the stand, are receivable." (3 Wigmore, Evidence, (3d ed. 1940) 733, § 1041.) We recognize, of course, that the testimony of the witness in the damage action related to values as of the spring of 1953, whereas the date of valuation in the instant case was January 4, 1956. Nevertheless, we think the former testimony of the witness related to a valuation date sufficiently proximate to that of the instant case that the jury should have been permitted to consider whether the opinions were consistent and reconcilable in the light of such reasons and explanations as the witness might have given (*cf. People* v. *Donovan, supra,* 43 Cal. 162, 166).

Viewed separately, each of the errors above discussed is deemed substantially prejudicial; and viewed in combination, we think they clearly operated to deprive appellant of a fair trial. Other contentions advanced by appellant need not be discussed since they relate to matters unlikely to be presented upon a retrial.

The judgment is reversed.

Fox, P. J., and Ashburn, J., concurred.

A petition for a rehearing was denied July 14, 1958, and respondents' petition for a hearing by the Supreme Court was denied August 13, 1958. Carter, J., was of the opinion that the petition should be granted.