[Civ. No. 23443.   First Dist., Div. One.   June 27, 1967.]

CITY OF SANTA CRUZ, Plaintiff and Respondent, v. DAVID K. WOOD et al., Defendants and Appellants.

Hardy, Carley & Love, William S. Love, Kraft & Kraft and Eleanor M. Kraft for Defendants and Appellants.

Rodney R. Atchison, City Attorney, for Plaintiff and Respondent.

ELKINGTON, J.—Appellants, who were defendants in an eminent domain action, appeal from a judgment entered upon a jury verdict awarding them $257,352.48 for 29.54 acres of land. The intended public use was a sewage disposal facility of the City of Santa Cruz. The condemned property is part of a parcel of 44.81 acres purchased by appellants in 1962 for $250,000.

Appellants' first assignment of error is stated as: *The trial court committed prejudicial error in refusing to admit evidence of a contract to sell the condemned property for the sum of $750,000.*

The contract which was not allowed in evidence is entitled "Deposit Receipt." By its terms appellants purport to have received from "Earl J. Green or assignee" $1,000 as a deposit on appellants' "43.3 [*sic*] acres." The total price is fixed at $750,000, "$216,500.00 by cash and the balance of $532,000. by note and trust deed, said note payable $50,000. or more per year with no interest until paid—Beneficiary to release 4 acres upon payment of each $50,000. annual payment or any 4 acres upon payment of $50,000."

Earl J. Green, named in the contract, did not appear at the trial. In support of the contract's admissibility appellants produced Noel Atkinson, a "real estate consultant." His testimony was taken out of the presence of the jury.

Atkinson testified that another party had been interested in purchasing the property in question. He (Atkinson) went to a lending institution for the purpose of arranging the necessary financing. The financing did not materialize and the deal fell through; Atkinson explained this was because he had recommended against the financing. He then presented the deal to his "very first investors and they took it immediately." These investors consisted of a certain Kaplan family.

The Kaplans, according to Atkinson, were worth millions. They had extensive holdings in Europe and South America. Atkinson was familiar with their business affairs. They had "developed roughly thirty large parcels of property into residential subdivisions, shopping centers, apartments, et cetera" in California. Atkinson had sold them (as broker) several of

these properties. The Kaplans were the principals in the instant Santa Cruz transaction; they were "putting up all the money," and it was to be cash.

Elsewhere in his testimony Atkinson told the court that Earl J. Green, who had a net worth of $200,000, was going to put up one half of the money and that the Kaplans had "contacted several lending institutions . . . to arrange financing to consummate the deal." This proposed financing appears to have been planned on the security of the land here in question. They received only a "tentative commitment." Atkinson admitted, as to the other transactions in which the Kaplans had been involved, he had not known them to have put up as much as $100,000. He had known them, however, to put up as much as $100,000 worth of security in one deal. That security consisted of an equity in a ranch which was already mortgaged for $100,000.

Describing Green's part in the transaction Atkinson said he had "acted as the disclosed agent for an undisclosed principal on behalf of the Kaplans on a number of locations." When appellants' trial counsel asked, "[I]s it your nature to handle these things through a 'dummy,' Mr. Atkinson?" he replied, "There is a very common trait to hide the names of prominent individuals to prevent sticking their names on deposit receipts." It appears that the contract in question was mutually rescinded when Atkinson learned about the proposed condemnation proceedings. He testified that he advised appellants against a specific performance action on the contract, recommending instead the condemnation suit with the city.

In support of their contention that the contract here was admissible on the issue of value, appellants cite *County of Los Angeles* v. *Faus,* 48 Cal.2d 672 [312 P.2d 680]. That well known case, decided in 1957, seems reasonably applicable here, although it concerned sales of similar property as evidence of value. *Faus* allows such evidence within what it calls "safeguarding limits." (P. 678.) Quoting and approving McCormick on Evidence, the court there stated that these safeguards among others are the following: ". . . *that the price realized for the other land may fairly be considered as shedding light on the value of the land in question. Manifestly, the trial judge in applying so vague a standard must be granted a wide discretion. . . . 'In any event, the sale must be genuine, and the price must be actually paid or substantially secured.'*" (Italics added; pp. 678-679; see also *People* ex rel. *Dept. of*

*Public Works* v. *Kawamoto* (1964) 230 Cal.App.2d 18, 21 [40 Cal.Rptr. 685]; *Los Angeles City High School Dist.* v. *Kita* (1959) 169 Cal.App.2d 655, 662 [338 P.2d 60]; *People* ex rel. *Dept. of Public Works* v. *Murata* (1958) 161 Cal.App.2d 369, 375 [326 P.2d 947].) And in an analysis of *Faus* it has been stated that if the evidence in question is of slight weight, the judge is justified in excluding it entirely because of its prejudicial or dangerous effect. (*Los Angeles City High School Dist.* v. *Kita, supra.*)

Applying the rule of *Faus* we have little difficulty in holding the court's rejection of the proffered evidence to have been well within its area of discretion, and proper. The contradictions of Atkinson's testimony, the unwillingness of the real party in interest to be bound by the contract, the improbability of Green himself being able or willing to perform, and the clear speculative nature of the transaction, create much doubt as to the genuineness of the sale and whether the stated price would actually be paid or secured. Indeed, the apparent necessity for the Kaplans "to arrange financing [on the security of appellants' land] to consummate the deal" makes it uncertain as to whether it was intended that appellants hold a first or second trust deed as security for the contract's deferred payments.

The court could, and probably did, conclude that the Kaplans planned to put little or no money into the deal—but instead to have substantially the entire purchase price financed on the security of the property itself. If defendants expressed dissatisfaction with such an arrangement the Kaplans were free to remain out of the picture, leaving their "dummy" Green as the only person from whom enforcement of the contract, or damages, could be sought.

In commenting on the offer of proof the court said, ". . . I feel that it is not a fair indication of the value of the property. . . . [I]t is not the type of evidence that would help the jury in ascertaining the fair market value." We agree.

The second assignment of error is: *The trial court erred in refusing to admit into evidence statements of respondent's City Engineer and Director of Public Works, made in respondent's application for a federal grant for the sewage treatment works.*

The referred to application was made more than a year before the trial. It recited the proposed acquisition of some of the land which was the subject of the action below. It also included rights of way for a 72-inch outfall tunnel 4,300

feet long, which, from maps in evidence appears to cross a populated area of Santa Cruz. It also covered additional rights of way, which from the same maps appear to fairly interlace respondent city.

In the application for a federal grant respondent's Director of Public Works, Mr. Feiberling, made a breakdown of his total project cost estimate of $4,750,000. The estimated cost of land was stated as "Site acquisition 12 ± acres $344,000." This land cost estimate is the subject of the presently discussed assignment of error. The court allowed a reasonable examination of Mr. Feiberling which in part disclosed the following: "I made a guess as to the total cost of acquisition of all the rights of way and property which we would have to acquire for this entire sewerage project. . . . [I]t is described as the site, all of the property necessary for the project."

The court rejected the offer, stating among other things, "It may be a figure which somebody is using for some other purpose in which event it serves only to confuse the court and the jury. . . . It might have some other effect, but it certainly is not evidence . . . of the fair market value of the property."

The court did not err. Mr. Feiberling's estimate of $344,000 covered a part of the land here in question and many miles of rights of way. In our opinion it had no logical tendency to prove the land value in dispute, and hence was not relevant to the issues. (See Witkin, Cal. Evidence (2d ed. 1966) p. 266.) As was stated by the trial judge, it would serve only to confuse the court and jury. In any event the court's ruling was well within its proper area of discretion. (See *County of Los Angeles* v. *Faus, supra,* 48 Cal.2d 672, 678.)

Appellants' next assignment of error is: *The trial court erroneously refused to admit testimony regarding the reasonable probability of acquiring additional access to the subject property which would greatly enhance its market value.*

The property sought to be condemned lies close to the ocean beach. Between the property and the beach lies a railroad right of way. Over objection appellant sought to introduce evidence as to the policy of the railroad company in allowing overpasses across its tracks, on the theory that such an access to the beach added an element of value to their property.[1] The court rejected the offer, stating that without

---

[1]The right of adjacent landowners to access across railroad rights of way seems not to be dependent on railroad company policy, but rather upon the provisions of section 7537, Public Utilities Code. This section

proof of a specific agreement such evidence was speculative and remote..

We believe the court's ruling here also was within its discretion. ■ Evidence which is remote, speculative or conjectural will not be allowed as proof of land value in condemnation cases. (*City of Monterey* v. *Hansen,* 214 Cal.App. 2d 794, 798 [29 Cal.Rptr. 863] ; *Joint Highway Dist. No. 9* v. *Ocean Shore Railroad Co.,* 128 Cal.App. 743, 764 [18 P.2d 413].

Appellants' final assignment of error is stated as : *The conduct of the trial judge prejudiced appellants' case and influenced the jury's decision.*

Appellants here point out 12 instances in which they say the trial judge by "His comments to the jury on the witnesses and the evidence, his rulings on the admissibility of evidence, and his demeanor toward appellants' entire case transmitted his feeling to the jury, all to the prejudice of appellants."

We have studied the record carefully. While the remarks of the court throughout the trial might properly have been more restrained, we conclude that the complained of conduct was not, nor was it intended to be, prejudicial to appellants' case. (See *Love* v. *Wolf,* 249 Cal.App.2d 822, 835-836 [58 Cal.Rptr. 42].)

The judgment is affirmed. Appellants to have their costs on this appeal.

Molinari, P. J., and Sims, J., concurred.

---

provides: "The owner of any lands along or through which any railroad is constructed or maintained, may have such farm or private crossings over the railroad and railroad right of way as are reasonably necessary or convenient for ingress to or egress from such lands, or in order to connect such lands with other adjacent lands of the owner. The owner or operator of the railroad shall construct and at all times maintain such farm or private crossing in a good, safe, and passable condition. The commission shall have the authority to determine the necessity for any crossing and the place, manner, and conditions upon which the crossing shall be constructed and maintained, and shall fix and assess the cost and expense thereof." Appellants' counsel asserted at the trial that this section gave appellants an absolute right to cross the tracks with the Public Utilities Commission setting the conditions.