[Civ. No. 6712.   Third Dist.   Dec. 21, 1942.]

CITY OF NAPA (a Municipal Corporation), Appellant, v. JAMES NAVONI et al., Respondents.

Nathan F. Coombs and Coombs & Dunlap for Appellant.

King & King for Respondents.

SCHOTTKY, J. pro tem.—This is an appeal from a judgment awarding respondents damages in the sum of $2,590 for the laying in certain real property belonging to respondents, of a pipe line which supplies the city of Napa with water. The property in question, known as the Newall Ranch, consists of the lower or westerly portion of about ten acres devoted to pasture and some fruit trees, and the upper or easterly portion of about seven acres now devoted to the family home, yards, flower and shrub garden with ornamental trees, vegetable garden and prune orchard, and is situated on a public highway known as the Silverado Trail, about two miles northeast of Napa. On September 7, 1938, this ranch was owned by all of the respondents except the estate of Mary Navoni, subject to a life estate of Mary Navoni who was in possession of the land. On that date Mary Navoni and respondents, by deed, granted to appellant city of Napa an easement and right of way twelve feet wide for the construction of a 24-inch water main along and inside of the fence-line of the property, a distance of 1,075.1 feet, for the sum of $200, as

originally surveyed and projected. The water main was to leave the Navoni property at the end of this line and proceed along the edge of the highway, but the city engineer decided that, in order to avoid obstructing the public thoroughfare, it would be better to continue its course inside the fence, and the course of the main was revised accordingly. The contracting firm in charge of the work paid to the life tenant, Mary Navoni, the sum of $75 for this additional strip, and then excavated a trench 3 feet wide and 5 feet deep and 682 feet long through the Navoni yard, garden and orchard, and installed therein a 24-inch main.

Mary Navoni died on February 15, 1939, and on May 23, 1939, appellant city commenced an action to quiet title to the easement granted to appellant by respondents and by the then life tenant, Mary Navoni. Respondents filed an answer denying that appellant had any interest in the 682 foot strip, but did not deny the interest of appellant in the 1,075 foot strip; and respondents also filed a cross-complaint to quiet their title to the entire 17 acre tract with the exception of the 1,075 foot strip. Appellant in its answer to the cross-complaint, set forth the granting of the easement in the 682 foot strip by the then life tenant, Mary Navoni, on October 8, 1938, and alleged further, in substance, that respondents had full knowledge of the negotiations between Mary Navoni and the contractor, and had acquiesced in the sale of said right of way, and were, therefore, estopped from maintaining to the contrary. Thereafter, appellant filed an amended complaint, following the language of appellant's answer to the cross-complaint, the prayer of the amended complaint being that appellant's title be quieted to an easement for the entire extent of the pipe line in respondents' property. Respondents filed an answer to the said first amended complaint, denying the allegations thereof hereinbefore referred to.

In this state of the pleadings the action proceeded to trial, and after the trial had proceeded for nearly two days, it is apparent from the record that counsel for appellant reached the conclusion that appellant could not establish any right to the 682 foot easement by reason of the deed from the life tenant, Mary Navoni, and the parties entered into a so-called "stipulation and order to amend first amended complaint." By the terms of this stipulation, Bertha Navoni Morse, also named as a defendant in her individual capacity, was brought

in as a defendant in her representative capacity as administratrix of the estate of Mary Navoni, deceased. The stipulation then proceeds as follows:

"That the compensation and damages accruing to the respective defendants for the easement and right of way for pipe line purposes over, along, across, and upon the real property particularly described in Paragraph II of the first count of plaintiff's First Amended Complaint and in Paragraph V of the second count of plaintiff's First Amended Complaint (excepting that portion thereof described in that certain indenture, dated September 7th, 1938, made by George Shane, et al., to City of Napa, a Municipal Corporation), be ascertained and adjudged in this action; and that upon the payment to said defendants, or into Court for their benefit, of the compensation and damages so ascertained, the Court make and enter a final judgment and decree quieting plaintiff's title to said easement and right of way for pipe line purposes over, along, across, and upon said real property particularly described in Paragraph II of the first count of said First Amended Complaint and in Paragraph V of the second count of said First Amended Complaint."

Thus, it will be noted that while both the amended complaint of appellant and the cross-complaint of respondents are in the form of quiet title actions, the foregoing stipulation for all practical purposes converted the action into an eminent domain proceeding, with a provision that appellant should have its easement in the 682 foot strip of land upon payment to respondents of the compensation and damages when ascertained by the court.

At the conclusion of the trial the court found that appellant city, through its agents and employees had, without the consent of respondents, unlawfully entered upon and trespassed upon the said real property, excavated a large ditch, and laid thereon a 24-inch water main across said 682 foot strip; that Mary Navoni had no power to make contracts for respondents and that the contractor had no power to make contracts for appellant; that respondents did not make any misrepresentations to appellant or its agents in regard to the granting of an easement on said 682 foot strip, and that appellant did not rely upon any representation of respondents, and that it is not true "that cross-complainants had knowledge or notice of the alleged fact that plaintiff and said contractor

were purchasing any easement from said Mary Navoni upon the faith of any representations, statements or conduct of said cross-complainants and said Mary Navoni; cross-complainants are not estopped from maintaining that no easement has been acquired by plaintiff over the real property described in paragraph III hereof.'' And the court found further as follows:

*''That said water main ever since has been and now is in said lands of said cross-complainants and is of the reasonable market value of $2380.18;* that all of said real property is planted to garden and trees and is cultivated; that in such excavation three trees, of a reasonable market value of $30.00 were killed; that by reason of plaintiff's said unlawful entry and trespass as aforesaid and as a proximate result thereof, cross-defendants have been damaged in the sum of $2590.00.''

Judgment followed that respondents were entitled to judgment for damages against appellant in the sum of $2,590, and that upon the payment thereof the right, title and interest to ''said easement and pipe line shall vest in plaintiff, to continue during the existance of the pipe line therein.''

Appellant's first contention is that its motion for judgment, made at the opening of the trial, should have been granted because respondents could not maintain an action for damages arising during the occupancy of the property by the life-tenant. We deem it unnecessary to discuss this point, because, even if the denying of this motion was error, which, however, we do not hold, it was certainly cured by the subsequent stipulation of the parties that the court might assess the damages.

Appellant's second contention is that it was not a trespasser, and that the finding to that effect is not sustained by the evidence. We believe that this finding is fully sustained by the record, but in view of the stipulation of the parties that the court might assess the damages and compensation, the question of whether or not appellant was a trespasser becomes unimportant, and the same may be said as to the contention of appellant that the trial court erred in excluding evidence of acquiescence by the remaindermen.

Appellant next contends that the trial court erroneously based its judgment on the value of the pipe line, and cites a number of decisions to the effect that the value of improvements put on the land is not to be considered in assessing damages. Respondents, in reply, assert that there is nothing

to indicate that the court used the value of the pipe-line as any basis for its award.

The court found:

"*That said water main ever since has been and now is in said lands of said cross-complainants and is of the reasonable market value of $2380.18;* that all of said real property is planted to garden and trees and is cultivated; that in such excavation three trees, of a reasonable market value of $30.00 were killed; that by reason of plaintiff's said unlawful entry and trespass as aforesaid and as a proximate result thereof, cross-defendants have been damaged in the sum of $2590.00."

It will be noted that the court found that the water main in the lands of respondents was of the reasonable value of $2,380.18, but we cannot say that the court used this value in arriving at its later finding that "by reason of plaintiff's said unlawful entry and trespass as aforesaid, and as a proximate result thereof, cross-defendants have been damaged in the sum of $2590.00." In view of the fact that there was testimony that the detriment caused to the land of respondents by the construction of said water main through the property was much greater than the amount of the judgment, it is quite unlikely that the trial court considered the value of the water main itself as an item of damage.

■ As is stated in 24 California Jurisprudence, page 1007, section 229:

"Findings should be accorded a liberal construction, with a view of supporting, rather than defeating, the judgment. They should not be construed with the strictness appropriate to the consideration of a complaint which is attacked by a special demurrer. Nor should the words employed be accorded a technical construction, or be so strained as to make out a case of conflict. Rather should the findings be construed as a whole, and reconciled, if possible, so as to prevent a conflict upon material points. They should be considered in connection with the pleadings, and the entire evidence in the case, together with such inferences of fact as the trial court might properly draw therefrom . . . "

And from the same volume, at page 1009, section 230:

"It is an established rule of law that the findings of fact are to receive such a construction as will uphold rather than defeat the judgment thereon. For this purpose they are to be liberally construed, and any ambiguity or inconsistency there-

in is to be resolved in favor of sustaining the judgment. If a finding is susceptible of two constructions, one of which is supported by the evidence and the other is not, the former is given. And whenever from facts found other facts may be inferred which will support the judgment, such inference will be deemed to have been made."

Our conclusion upon this point is that the findings, fairly and liberally construed in accordance with the above quoted principles of law, do not show that the trial court based its judgment upon the value of the pipe-line. It must be borne in mind that under the stipulation of the parties the court was to ascertain the "compensation and damages accruing to the respective defendants for the easement and right-of-way," and this, in our opinion, is all that the trial court endeavored to do, and did do.

Appellant's fifth contention is that the court erred in admitting evidence as to the value of the property when subdivided into lots.

It was the theory of respondents throughout the trial that the front portion of the Navoni ranch, through which the 682 foot right-of-way ran, was adapted to homesites, and that the installation of the water main near the highway destroyed its adaptability for that purpose. Respondents therefore sought to show the market value of the land before the installation of the pipe-line and afterward.

The following occurred in the testimony of W. B. Griffiths, a real estate broker of Napa, one of respondents' witnesses:

"Q. Now, Mr. Griffiths, in the summer and early fall of 1938 before any pipe line was placed across the seven acres, what in your opinion was the actual market value of those seven acres? A. What year? Q. In 1938 before any pipe line was put through there, as acreage or as lots, will you state the total value and then if you want to divide it up into lots, that is up to you. A. Well, commercially that land would be worth about $400. an acre, and as lots, about $500. a lot. Mr. Lochman: Just a minute, Mr. Griffiths. Object on the ground its value as lots is incompetent, irrelevant and immaterial; that the cases hold that the value for sub——that the availability of the property can be shown for subdivision purposes but that its value for such purposes cannot be testified to."

After argument, the court overruled the objection and the witness continued:

"A. The first seven acres, the value of that seven acres, Your Honor, I figure commercially, from a standpoint commercially, around $400 an acre. It is a very valuable piece of vegetable and berry land. It is alluvial, it is different from the surrounding ground. It is in a class by itself. Then if it is divided into lots along that high ground along the highway in 60 by 120 foot lots, they would sell at $500. very easily under present conditions. The Court: What frontage? A. 60 by 120. The Court: I see. Mr. King: 60 foot frontage. Q. Mr. Griffiths, taking a strip of land along the southerly side of the seven acres which would front on the Water Works Road, all paved highway—Mr. Lochman: (interrupting) What was the size? Q. Taking a strip of land 120 feet deep and running from the northeast corner of the Navoni property down to a point where that road turns, 682 feet where the pipe line joins the old granted pipe line, about two acres in area, what in your opinion was the actual market value of those two acres in 1938 before any pipe line was put in there?"

Counsel for appellant again objected on the same grounds, and the court overruled the objection and the witness continued:

"A. As to what it was worth before the pipe line went in? Q. Yes, these two acres on the front along the road. A. Value that portion $500. a lot and that front would be a matter of square feet per acre, not square feet in a lot. Q. Assuming it is divided into eleven lots of at least 60 feet frontage and 120 feet—Mr. Lochman: Objected to on the grounds it is speculative and remote, not the proper measure of damages, incompetent, irrelevant and immaterial. The Court: Answer the question. A. The value would be the same. I think the value would be $500. on the basis of $500. a lot. Q. And eleven lots would make it $5500., wouldn't it? A. That is what they would sell for. Q. All right, and what would be the actual market value of the remaining five acres of that seven acre tract before the pipe line was put in? A. I base the back part on a commercial basis, vegetable and berries, $400. an acre. Q. $500. an acre. That would be $2000., wouldn't it? A. For the back portion. Q. And then is it your opinion that the total actual market value of seven acres before the pipe line was put in was $7500.? A. Yes. Q. Now, Mr. Griffiths, assuming that in the fall of 1938 a pipe line was installed along the front of that two acre tract I have just described by excavation similar

to that contained in this defendants exhibit for illustration, let's call it 'X'—it has no number, and I don't know what the next number is—such excavation having been made a distance of 682 feet across the front of that whole strip along the road at a point and at points on a line more or less paralleling the highway and from six to twenty feet inside of the property line, such taking to be a perpetual taking with the right to come on the property to dig up the pipe line, maintenance, keep it in repair, what would be the value of that two acre piece after such pipe line has been installed? A. It would practically eliminate the possibilities of lots, for the reason no one with small acreage wants an easement over his property with possibility of having his front lawn, flowers and shrubs dug up. Mr. Lochman: Objected to on the ground the answer is not responsive to the question. The Court: Well, I think it is. Go ahead, answer. A. Digging up the ground from lower down, no plant life in it, throwing it on the surface, making a change in your conditions, the surface conditions. Every householder that would buy a lot wants to have their lawns and flowers in front. Personally, I wouldn't buy a lot of that character with such an easement in front of it if I was looking for a homestead, nor would I as a broker handle such a subdivision. Q. What, in your opinion, would be the value of that two acre piece after the installation of such a pipe line? Mr. Lochman: Just a minute, Mr. Griffiths. I will ask that all the evidence, testimony given by this witness in response to the preceding question be stricken out on the ground it was not responsive to the question. The Court: Well, your motion may be denied. Q. Now, you may answer. The Court: I don't think, Mr.— Q. In your opinion, Mr. Griffiths, what would be the value of the two acre strip I have described along the front after the installation of a pipe line such as I have described? A. It would put it back on a commercial basis, $400. an acre all the way through. Q. In your opinion, what would be——eleven lots be worth after the installation of that pipe line? The Court: He says nothing. A. As lots. The Court: He said it reverts to commercial use only. Q. And for its commercial use, what would it be worth, in your opinion? A. As acreage? Q. Yes, those eleven lots? A. $400. an acre. Q. And if there were two acres there, it would be $800.? A. Yes."

Appellant cites the following language from *Sacramento, etc. R. R. Co.* v. *Heilbron,* 156 Cal. 408, 412 [104 P. 979] :

"It is seen, therefore, that this court by its latest utterances has definitively aligned itself with the great majority of the courts in holding that damages must be measured by the market value of the land at the time it is taken, that the test is not the value for a special purpose, but the fair market value of the land in view of all the purposes to which it is naturally adapted; that therefore while evidence that it is 'valuable' for this or that or another purpose may always be given and should be freely received, the value in terms of money, the price, which one or another witness may think the land would bring for this or that or the other specific purpose is not admissible as an element in determining that market value. For such evidence, opens wide the door to unlimited vagaries and speculations concerning problematical prices which might under possible contingencies be paid for the land, and distracts the mind of the jury from the single question—that of market value—the highest sum which the property is worth to persons generally, purchasing in the open market in consideration of the land's adaptability for any proven use."

A most enlightening discussion of the rules pertaining to this subject may be found in the case of *Joint Highway Dist. No. 9* v. *Ocean Shore R. R. Co.,* 128 Cal.App. 743 [18 P.2d 413], and we quote from page 753-759 of that decision:

"In our opinion the difficulty encountered in reconciling the various decisions and the language used by the various courts is due in part to the fact that the word 'value' is frequently used but it is often impossible to determine the sense in which the word is employed. . . . The distinction between value in use and value in exchange or market value has been generally recognized by the courts and it is well settled that it is the market value which governs in proceedings in eminent domain and not the value in use to either the owner or condemnor. . . . We believe it perfectly clear that certain land may be of but small value in use for one purpose and of much greater value in use for another purpose. It may therefore be said to have a different value for one purpose than for another if the word value be understood as meaning its value in use. ██ But a given piece of land has only one market value and not a certain market value for one purpose and a

different market value for another purpose. This is true because by what has been termed the classic definition, 'market value' is fixed as the 'highest price estimated in terms of money which the land would bring if exposed for sale in the open market with reasonable time allowed in which to find a purchaser, buying with knowledge of all the uses and purposes to which it was adapted and for which it was capable.' (*Sacramento R. R. Co.* v. *Heilbron, supra,* p. 409.) This market value may be greater or less than the value in use to either the owner or the condemnor, but in the eyes of the law it is a fixed amount determined by 'the highest sum which the property is worth to persons generally, purchasing in the open market in consideration of the land's adaptability for any proven use.' (*Sacramento R. R. Co.* v. *Heilbron, supra,* p. 412.)''

After thus defining the distinction between value in use of property and its market value, the court answers the very contention here made by appellant, saying at page 759:

''Appellant further attacks the competency of respondents' evidence on market value upon the theory that such testimony was merely of 'market value in itemized terms of money for the property's highest available use.' We have above indicated that in our opinion property has but one market value, and not a certain market value for one particular use and a different market value for another use. If, under the established rules, a witness is shown to have sufficient qualifications to give an opinion on market value he may do so even though he knows nothing of the value in use of the property for uses other than its highest available use. [Quoting from *City of Stockton* v. *Ellingwood, supra.*] . . . We believe that if we may properly speak of the *market* value of the land for its highest available use, such *market* value must necessarily be the same as the market value of the land.''

In a late annotation (124 A.L.R. 911), the rule is similarly declared in the following language:

''The market value of the land is determined by taking into account the highest possible use to which the land is or may reasonably be put or be adopted and what purchasers would be willing to offer for it in view of such highest possible use. 18 Am.Jur. 879, Eminent Domain, sec. 244.'' Quoting from page 914:

''As stated above, the test of determining the owner's com-

pensation is the market value of the land. But since the highest possible use to which the land may reasonably be adapted may be taken into consideration in determining what the market value of the land is, it is generally recognized that in determining the market value of the land to which the owner is entitled, the special adaptability or availability of the land for the use for which it is taken may be shown and taken into account, and if such adaptability or availability would increase the value of the land in the eyes of purchasers generally in the open market, quite apart from the necessities or needs of the particular condemnor, the owner may be entitled to such increase as a part of its market value.'' (See also *City of Stockton* v. *Ellingwood, supra; McCandless* v. *United States,* 298 U.S. 342, 345 [56 S.Ct. 764, 80 L.Ed. 1205].)

Appellant contends that the trial court committed reversible error in permitting the witness to answer the questions objected to. We cannot agree with this contention for a number of reasons. In the first place, we believe a fair reading of the testimony of the witness Griffiths will show that in his opinion the highest use to which the two acres fronting the highway was adapted was for residence site purposes, and that in giving his opinion as to the market value of said two acres he computed said total value on the basis of the frontage of 682 feet, in units of 60 feet. There was nothing remote or speculative about the use of the property for residence lots, as the testimony of the witness showed that there was a present demand for such lots. Assuredly it was proper for him to give, as he did give, his opinion as to the market value of said two acres before the pipe-line was installed, and its market value thereafter, and even though under a very strict construction of the law, he should not have been permitted to give the value in units of 60 foot lots, it is difficult to understand how any prejudice could have resulted in the instant case, which was tried by the judge without a jury, and in which the judge had inspected the premises in question before the testimony as to value was given.

The following language from *Joint Highway Dist.* v. *Ocean Shore R. R. Co., supra,* at page 765, is quite applicable here:

''It may therefore be freely conceded that the above mentioned evidence and other evidence in the record should have been stricken, but it does not necessarily follow that the action of the trial court in admitting such evidence and thereafter

failing to strike the same constituted prejudicial error requiring a reversal. In *City of Stockton* v. *Ellingwood,* [96 Cal. App. 708 (275 P. 228)], *supra,* at page 742, the court quotes from *City of Ely* v. *Conan,* 91 Minn. 127 [97 N.W. 737], as follows: 'Ordinarily the admission or exclusion of opinion evidence, where it is not of a determinative character, is not regarded as sufficient to justify a reversal.' This is more particularly true where, as in the present case, the cause was tried by the court sitting without a jury and it does not appear that the trial court's determination of market value was in any way influenced by the testimony erroneously admitted. While the objectionable testimony contained figures in excess of the highest estimates found in the competent testimony on market value, the trial court fixed the awards at figures far below the lowest estimates of market value found in any of the testimony, competent or incompetent, offered by respondents. It is quite apparent that the trial court made its own determination of the market value of the land, using the opinions on this subject merely as an aid for that purpose and giving to such opinions only the weight to which they appeared to be entitled. This was entirely proper and we find no prejudicial error in the admission of the incompetent testimony referred to or in the refusal to strike out said testimony."

In 5 Corpus Juris Secundum, at page 996, it is stated:

"Error in admitting opinion evidence may be regarded as harmless where the objecting party has an opportunity to cross-examine the witness and to show the real value of his testimony. Error in the admission of opinion evidence may be regarded as harmless where the opinion relates to the amount of damages recoverable, and the verdict is for a much less sum than the witness testified should be allowed, where the verdict is not excessive or where the jury might properly have rendered a verdict for a greater amount."

Furthermore, it must not be lost sight of that the instant action was commenced by appellant as a quiet title action, not as an action in eminent domain, but that after it became apparent that appellant had, without right, entered upon the 682 foot strip and constructed the pipe-line thereon, the parties stipulated that the "compensation and damages accruing to the respective defendants for said easement and right-of-way be ascertained and adjudged in this action." Therefore, while in a sense, the action was converted into an

eminent domain proceeding, yet in view of the nature of the action and the language of the stipulation, we believe that the trial court in the instant case was not so restricted in its reception of evidence as it would have been in a strict eminent domain action.

■ Appellant's final contention is that the damages awarded were grossly excessive and obviously given under the influence of passion or prejudice. There is no merit in this contention, as there was ample evidence to support a judgment for a much larger sum than the amount awarded by the court. The witness Griffiths testified that the upper seven acres of the Navoni ranch was of the market value of $7,500 before the pipe-line was put in, and of the market value of $2,800 after it was put in; and there was evidence of a similar nature from other witnesses. So far as the evidence, as shown by the record, is concerned, appellant has less cause to complain of the amount awarded than have respondents.

In view of the foregoing we are satisfied that the judgment is amply supported by the evidence; that no errors have occurred which resulted in a miscarriage of justice; and that the judgment should be affirmed.

The judgment is affirmed.

Thompson, J., and Adams, P. J., concurred.