Scott *v.* State.

5-1870

326 S. W. 2d 812

Opinion delivered June 1, 1959.

*Eugene Coffelt,* for appellant.

*Hardy Croxton* and *Clayton Little,* for appellee.

PAUL WARD, Associate Justice. This is a condemnation proceeding instigated by the State of Arkansas for the use and benefit of the Pea Ridge National Park Commission, pursuant to the powers given by Act 192 of the 1957 General Assembly, to acquire 139 acres of land belonging to Mrs. L. D. Frances Scott, *et al.*

Pursuant to said Act the Commission is attempting to acquire the aforementioned land in order to convey it to the United States of America, or any of its agencies, for inclusion in the Pea Ridge National Park. Section Five (5) of the Act provides for the appraisal of the land by three qualified and impartial appraisers, but further provides that if the owners of the appraised land refuse to sell for the appraised price, then the Commission may acquire the same by condemnation. Suit was first filed in the circuit court of Benton County, but was removed to chancery court on the motion of the landowners. Later, however, the landowners chose to abandon all questions except the value of the land and asked to have the cause referred back to circuit court for a jury trial. This motion was refused, but, over the objections of appellant, a jury was impaneled in the chancery court to fix the amount of damages. After taking testimony and after the jury was instructed by the chancery court, a verdict was returned in favor of the landowners in the amount of $16,500, from which judgment comes this appeal by one, and only one, of the owners.

In view of the decision hereafter reached, many of the questions which were argued by both sides on appeal are passed over, and we will consider only the matter of the amount of compensation. It is conceded by both sides that the verdict of the jury fixing the amount of compensation was not binding upon the chancery court.

Therefore, we will review the proceedings as we do in a chancery case.

It is the contention of appellant that the Commission's appraisers valued the land solely for its agricultural purposes, and she insists their land has a peculiar or unusual value, aside from agricultural purposes. The testimony on the part of appellants is substantially as set out below.

Alvin Seamster testified in substance: I have been in Federal service and practiced law for more than 30 years; at the present time I am writing a history of Benton County and the Pea Ridge Battlefield and am well acquainted with Elkhorn Tavern, which is a part of the property being condemned; from history the Elkhorn Tavern property was used as a hospital for both the Union and Confederate soldiers, and the Elkhorn Tavern was the center of battle on the 7th and 8th; Elkhorn Tavern property has been used for a museum for the last 40 years; people go up there and go through the property, and I have been up there with groups of people to show them the battlefield; I have all the history that has been written about the battle of Pea Ridge and the Elkhorn Tavern, and I will produce the records providing they may be returned to me; the Elkhorn Tavern was built in 1832, and I know the history behind the horns that are on the Tavern; I know that Clyde Ellis, while he was in Congress, tried to get a bill through Congress to have it declared part of a national park; when the Tavern was rebuilt, it was built on the old foundation; the property will get more valuable as time goes on. Much of the testimony set forth above was objected to by the State and sustained by the court, but, as we shall later show, we think it was competent.

Wallace Scott testified substantially as follows: I have lived at Elkhorn Tavern 59 years, and Frances Scott is my mother; she is 93 years old and lives at the Tavern; she was born at the Tavern and the property in question has been in the Scott family since 1832; the property has been used as a museum, tourist attraction and park purposes for the last 40 years; people come up

there to look over the battlefield and see the museum; the chimney on the Tavern was built in 1833; we have not spent any money to develop it or promote it or advertise it; we keep registers for people to sign from time to time, and there have been people in the Tavern from 42 states and 6 foreign counties; I checked the number of people that went through the Tavern from May 1st until July 23rd, and during that time 4,360 people registered; we don't have any more people visiting the Tavern now than we did have years ago — in fact, there were more tourists in 1949 and 1950 than there are now; the property is not for sale and it has never been on the market for sale; we have had several chances to sell the property, and many of them tried to get us to make an offer, and one party in Oklahoma City has tried several times to buy the property. (The witness offered to show that an offer of $50,000 had been made for the property but was not allowed by the court to do so.)

Willie Galyen stated that he lived a mile from Elkhorn Tavern for 20 years and that people congregate there from everywhere and go to visit the old battlefield. He doesn't notice them visiting any of the other farms, but they come to Elkhorn Tavern, and there are no more people coming now than 5 or 10 years ago. Testimony similar to the above was given by Elmer Smith.

Edgar A. Harris testified in substance: I have lived at Springdale for a year and before that I lived in Oklahoma City, Tulsa, Claremore, Cleveland, Ohio, and Chicago; I am a retired educator, formerly connected with Oklahoma A. & M. and with the Department of Education in Oklahoma for 10 years, and am well acquainted with the Elkhorn Tavern property; I first visited the Tavern in 1932 with a group, and I wrote a thesis on the Creek Indians and Creek Nation in Oklahoma, wherein many references are made to the Battle of Pea Ridge in Indian History, and I understand that the Trail of Tears runs through the Elkhorn Tavern property; I am familiar with the value of property of the nature of Elkhorn Tavern for its unusual adaptability, and I have bought and sold property in Benton County; based upon my knowledge of the value of real estate and my acquaint-

ance with the Elkhorn Tavern property and what it is being used for, it is my opinion that it is worth $100,-000, and I think Elkhorn Tavern property could easily be sold for $100,000.

C. A. Linebarger testified in effect: I have lived in Benton County 58 years and I am one of the founders of Bella Vista and still own Wonderland Cave at that place; I developed that area and have spent my life dealing with tourists; I have been familiar with Elkhorn Tavern property since 1930, and at one time I tried to buy the property.

Mr. Hugh Johnson testified substantially as follows: I have dealt with tourists for the last 8 or 10 years and have been on the Elkhorn Tavern property only one time, but have heard of the property for the last 40 or 45 years; I am familiar with the value of property that attracts tourists and is capable of being used in the tourist business, and from my knowledge and experience, I place the value of the Elkhorn Tavern property at $125,000.

Bennie McCann testified in substance: I have been in the real estate business at Seligman, Missouri, for about 20 years, and I have been familiar with the Elkhorn Tavern property all my life, and it is my opinion that the fair market value of this property is $50,000, but if it were used as an ordinary farm I would place the value at $8,000 or $9,000.

Bill Hunt testified that he had been in the real estate business at Rogers for 20 years; that he was familiar with land values in Benton County, and with the Elkhorn Tavern property, and that he placed the value of said property at $50,000.

The following testimony was introduced on behalf of the State to show the value of the land taken:

Harry Pratt, County Clerk of Benton County, testified that the assessment record shows 118 acres assessed for 1950 through 1956 at a value of $300 and for 1957 it shows an assessed value of $790.

Joe Johnson, a real estate dealer and appraiser of farm lands in Arkansas, Missouri and Oklahoma since

1947, stated that he was one of the appraisers appointed under the provisions of said Act 192; that he appraised the Elkhorn Tavern property consisting of 139 acres at $9,067.50, *being $4,992.50 for the land and $4,279 for the* buildings; he stated that he appraised the value partially on an agricultural basis. In the explanation of the above, the witness stated that he appraised 24 acres on which the buildings were located at $70 an acre, 12 acres at $60 an acre, 12 acres at $14 an acre, 91 acres at $94.50 per acre; and the land right across from Elkhorn was appraised at $110 or $115 per acre. He also stated that in his opinion the tourist attraction feature added nothing to the value of the land unless they paid some money.

Jess DeFolliart, a licensed broker, stated that he was familiar with the Elkhorn Tavern property but had not been in the house and had not been in the museum; that the land is rough timbered land and partly brushy; and that from an agricultural standpoint, the property is worth $5,000, and for all purposes not to exceed $10,000. On cross-examination he said there is nothing at Elkhorn Tavern property to attract tourists, but later stated there might be some attraction. When asked if he appraised the property on the basis of a park, his answer was ''No''. He further stated: ''I appraised it, as I told you a while ago, on the basis of comparable land and improvements and what they would bring over the country.'' When asked how he appraised the property, he answered: ''Well, I placed the value of about, as far as agricultural purposes, of, I would say, around $3,500, and then added $10,000 for the historical situation.''

The last witness, who was a banker at Pea Ridge, stated that he had known the Elkhorn Tavern property all his life and was familiar with land values, but had no idea what the return would be from the tourists.

From the portions of the record set out heretofore and after a careful reading of the entire record, we cannot escape the conclusion that the Commission's testimony as to the value of the lands in question was based largely, if not entirely, on its use for agricultural purposes. Moreover, we cannot help but be impressed with

the fact that appellant was somewhat restrained from fully developing her case on her announced theory that the lands have a special value as a tourist attraction. We note that in some 40 or 50 instances when appellant was attempting to develop her case in accordance with her theory appellee objected and was sustained by the court. This court has many times recognized that land may have value based on peculiar qualities, conditions or circumstances, and we have many times announced rules relative thereto. In the early case of *Little Rock Junction Ry.* v. *Woodruff,* 49 Ark. 381, 5 S. W. 792, involving the taking of land by the railroad for a bridge site, the court approved from Mr. Cooley this statement: "The principle upon which the damages are to be assessed is always an important consideration in these cases; and the circumstances of different appropriations are sometimes so peculiar that it has been found somewhat difficult to establish a rule that shall always be just and equitable." In the case of *Gurdon and Ft. Smith Railway Co.* v. *Vaught,* 97 Ark. 234, 133 S. W. 1019, an action to determine the value of property taken for a railroad right-of-way, the court said it was competent to show its advantageous location for that purpose. In the same case the court said: "The owner has a right to obtain the market value of the land based upon its availability for the most valuable purpose for which it can be used. The peculiar circumstances of its location and the character of the surrounding country may be proved in order to show the adaptability of the land taken for the purpose desired because that would be an element of value which the owner would have a right to insist upon in estimating the value of his land."

The same principle was announced in *Ft. Smith & Van Buren District* v. *Scott,* 103 Ark. 405, 147 S. W. 440, where the value of land suitable for a bridge site was under consideration. There the Court said: ". . . we cannot see why these facts could not all be taken into consideration in estimating the value of the land condemned for a bridge site, nor why would they not have been such things as the owner of the land desiring to sell it would naturally call to the attention of one pro-

posing to buy." In speaking of the rule relative to the measure of damages the court said: "The measure of the owner's compensation for the land condemned is the market value thereof at the time of taking for all purposes, comprehending its availability for any use to which it is plainly adapted, as well as the most valuable purpose for which it can be used and will bring most in the market."

Text writers are also in accord with the rules above announced. In 18 Am. Jur., under the subject of Eminent Domain, Section 245 entitled "Value from Peculiar Availability for Use for which Taken," it is stated: "If, however, entirely apart from the fact that the property was taken for a particular use, it appears that it was exceptionally adapted and available for such use, as, for example, for a municipal water supply, or for a railroad, or for a bridge, and the necessity for such use was so imminent as to add something to the present value in the minds of possible buyers, that element may be considered in determining the fair market value." In 29 C. J. S. under Eminent Domain, Section 160, it is stated: "The value of land condemned is not to be estimated simply with reference to the condition in which the owner has maintained it or for the use to which it is at the time applied, but with reference to any use to which it is reasonably adapted."

In the case under consideration there is no room for doubt, it seems to us, that appellant's property has a peculiar and special value over and above its value for agricultural purposes. In fact, appellant does not claim that the land is valuable for agricultural purposes. It seems to us that the very fact that the State desires to acquire this land so that it may be deeded to the United States for national park purposes is a strong indication that appellant's land has a peculiar value. We think appellant's witnesses were qualified to testify regarding this peculiar value. Since, as we have heretofore stated, it appears that appellee's testimony regarding the value of the land in question failed to fully take into consideration this peculiar value, we feel that great weight must be given to the testimony of appellant's witnesses. Since

their testimony fixes a minimum value of $50,000, and since we try the case *de novo* as in other Chancery appeals, we conclude that a value of $30,000 for the lands in question is established by the weight of the evidence.

We are unable to determine from the record what interest appellant has in the land or how many other people have an interest therein. Therefore, we are remanding the case to the trial court to determine the exact interest appellant has in the property.

If, however, there are other parties holding an interest in the land in question they will not be allowed to benefit by the increased amount of damages resulting from this decision because they have not appealed from the decree of the trial court. See: *Clark et al* v. *Barnett*, 24 Ark. 30; *Thorn and Wife* v. *Ingram*, 25 Ark. 53; *Cannon* v. *Lunsford*, 89 Ark. 64, 115 S. W. 940; *Moore* v. *Price*, 101 Ark. 142, 141 S. W. 501; *Maners* v. *Walsh*, 180 Ark. 355, 22 S. W. 2d 12; *A. S. Barboro and Co.* v. *James*, 205 Ark. 53, 168 S. W. 2d 202 on rehearing at page 61 of the Arkansas Reports. The rule announced by these cases is well stated in the headnote of the *Clark* case, *supra,* which reads: ''It is the settled practice in this court not to disturb the decree of the court below for errors committed against a party who does not appeal from the decree.''

The decree of the trial court is therefore modified to the extent heretofore mentioned and the cause is remanded with directions to determine what interest appellant has in said lands and, based on such determination, to award her the correct portion of $30,000, and to award each of the other interested parties his or her correct portion of $16,500.

Modified and affirmed.