ARKANSAS STATE HIGHWAY COMM'N *v.*
JULIUS N. DeLAUGHTER, JR., A MINOR

5-5583                                    468 S. W. 2d 242

Opinion delivered June 21, 1971

*Thomas B. Keys* and *Bedford G. Webb,* for appellant.

*R. D. Rouse* and *Tackett, Young, Patton & Harrelson,* for appellee.

J. FRED JONES, Justice. This is an eminent domain case in connection with the construction of Interstate Highway No. 30 through Nevada County, Arkansas. The State Highway Commission took 30.66 acres for highway purposes diagonally, in a northeasterly-southwesterly direction, across a 409 acre tract belonging to Julius N. DeLaughter, Jr., leaving approximately 182 acres west of the right-of-way and approximately 196 acres east of the right-of-way. The west end of the tract fronts, for approximately one-half mile, on old Highway 67, or Bowden Road; and the east end of the tract is bounded by the Little Missouri River. The Commission deposited $8,750 into the registry of the court as just compensation. Two expert witnesses for DeLaughter testified to damages in the amounts of $38,649 and $30,365 respectively as just compensation. The jury awarded $23,699; judgment was entered for that amount and on appeal the Commission has assigned error under designated points as follows:

> "The court erred in allowing testimony regarding alleged valuable gravel deposits on the subject land without a proper foundation being laid for the introduction of such evidence.
>
> The court erred in refusing to strike the testimony of Charles Wilburn and P. M. Brown, witnesses for the appellee, based on their testimony of inconsistent highest and best uses of the subject property."

Mr. DeLaughter, the owner, is 20 years of age and testified that he acquired the land from his grandfather and had been familiar with it ever since he was two years of age; that ever since he has known the property it has been used for "cattle grazing and gravel operation." He testified that approximately one-half of the land is open and one-half in wooded area; that prior to the taking he had access to all fields and that his cattle could run free through the bottom land without

the hazard of being trapped by high water coming up from the river on the east portion of the land. He says that since the highway has been constructed his only access from the west to the east portion of the property is through underpasses built for relief bridges for Black Bayou and another creek that runs from west to east across his land and empties into the river. He says that during the winter months and during rainy seasons he is unable to get any kind of vehicle from the west to the east side of the property because of the high water in the creeks in the underpasses. He says that since the construction of the highway all the surface drainage from his property west of the highway must flow through the two underpasses; that when the water backs up in the creeks, his cattle can not get through the underpasses and are in danger of being cut off from access to high ground by the rising water from the river. Mr. DeLaughter answered questions propounded by his attorney as follows:

"Q. What farm equipment can you get through those underpasses to the big tract of land?

A. This big tract of land?

Q. The 196 acre tract?

A. I can't get any farm equipment at the present time.

Q. Can you get any gravel equipment, gravel trucks or equipment through there?

A. No, there is no way."

Mr. DeLaughter testified that the only future use he could make of the land east of the highway would be for cattle grazing, which would be limited to approximately six or seven months out of the year. He testified that he has been selling gravel from a gravel pit on approximately 20 or 25 acres "above relief bridge number two on high ground"; that the gravel pit is approximately 30 steps from the right-of-way taken,

and that since October, 1967, he has received a total of $8,458 for gravel sold from the property. He testified that there was some gravel on the east side of the right-of-way, but that he has sold no gravel from that area. He testified that he did sell some fill dirt from approximately two acres on the east side of the right-of-way for use in the construction of the interstate. He says that prior to the taking his land would support approximately 170 head of brood cows and that since the taking he can run approximately 70 to 90 head of brood cows on the property. Mr. DeLaughter testified on redirect examination that he could not get vehicles and farm machinery from the west side to the east side of his property at any time, and that cattle could go from one side to the other for approximately six or seven months out of the year.

Mr. Roy Stanley, a geologist, testified that he was familiar with the land involved; that it is farm and cattle grazing land containing extensive deposits of sand and gravel which could be commercially extracted.

Mr. Charles Wilburn, a realtor from Texarkana, testified that he had familiarized himself with the property involved and as to the highest and best use of the land in question, he testified as follows:

"Q. Do you have an opinion what the highest and best use is?

A. I do.

Q. What is that opinion?

A. The highest and best use is farming grazing, cattle operation.

Q. Are there any other uses that this land might be put to?

A. It is enhanced with gravel.

Q. What do you mean enhanced with gravel?

A. It has the possibility of gravel production."

This witness testified that the fair market value of the property prior to the taking was $122,700 or $300 per acre, and that after the taking the remaining property had a market value of $84,051, leaving a difference of $38,649 as damage to the property because of the taking. This witness testified that he took into consideration comparable sales in the area consisting of one sale of upland at $200 per acre; another sale of 147.99 acres at $223 per acre, and another at $187.50 per acre. This witness then testified as follows:

"Q. Tell the jury why you feel the market value has been effected in the sum of $38,649?

A. Well, if I want to buy a 378 acre place or had a prospect looking at it, he would, in my opinion, sincerely question the access if I've got limited access to property over a property that didn't have any restrictions. 378 acres in one tract where you could go from one side to the other, the cattle could move freely from one side to the other, and like property that would be controlled with access and subject to flooding where you couldn't get cattle back through the area that remained open, then it would seriously affect the market value of the property."

On cross-examination Mr. Wilburn testified that he had been on the property eight or ten times since 1967 and he then testified as follows:

"Q. Talking about this highest and best use, now as far as cattle ranching and gravel mining is concerned, what portion of that do you place the highest and best use on for cattle ranching?

A. To the extent of the market value of cattle land, grazing land, river bottom land.

Q. You put the entire tract all as cattle ranching?

A. It is enhanced by the value of the gravel being underneath it.

Q. What I want to know, are you placing so-called and across the board highest and best use to the whole 409 acres as cattle ranching?

A. That would be the primary use for it.

Q. How much of your $38,649 that you testified to are you attributing to the gravel portion of it?

A. You don't separate it, it's being enhanced. Like a farm being nearer town. It may be better but you don't know how much better. It depends on the market."

On redirect examination Mr. Wilburn testified that in arriving at his opinion as to the value of the land before and after taking, he took into consideration the fact that there were gravel deposits on the land, and that he took into consideration sales of comparable land containing gravel deposits. He testified as to sales of comparable gravel land in Clark and Little River Counties ranging in price from $380 to $700 per acre. The Highway Department moved to strike Mr. Wilburn's testimony *in its entirety* for the reason it stated as follows:

"He put the highest and best use of cattle ranching and he says it's enhanced by gravel deposits which he also states has a highest and best use. It is our position the highest and best use are totally inconsistent. You cannot graze cattle and mine gravel off the same tract of land. He was unable to separate that portion of the testimony he attributed to the highest and best use for gravel as to the cattle ranching. It is inconsistent and improper and we move it be stricken."

The motion was denied by the trial court.

. Mr. P. M. Brown, another real estate appraiser and broker from Texarkana, testified as an expert for the owner. He testified that he had been familiar with the land involved since the taking in 1966. He testified that the fair market value of the entire tract at the time of the taking was $143,150, and that after the taking the value was $112,785, leaving a difference of $30,365 which he considered as just compensation. He also testified that he took into consideration comparable sales within the area including 160 acres which sold for $28,800, which amounted to $180 or $190 per acre; another sale of 324.40 acres which sold for $62,500, or approximately $190 per acre. This witness also testified as to sales of lands for gravel including a 20 acre tract near the Caddo River which sold for $400 per acre, and a 40 acre tract which sold for $875 per acre. He also testified as to another sale of comparable partially overflow land on Little River consisting of 95.22 acres which sold for $525 per acre. This witness testified that in his opinion the highest and best use of the property involved was for farm and grazing land enhanced by gravel deposits, and that in his opinion, just compensation would be $30,365. Mr. Brown then testified that he based his severance damage on lack of access from the west portion to the east portion during the winter months and during wet weather. This witness testified that there were considerable gravel deposits on both sides of the right-of-way and then testified as follows:

"Q. Do you know whether or not this gravel has been marketed?

A. Yes, sir. There has been gravel marketed off it.

Q. You know whether it has been marketed in a commercial quantity?

A. Yes, sir. The evidence is on the ground.

Q. Did you use this as a basis or one of the basis for your opinion in arriving at the fair market value of the land before and after the taking?

A. Yes, sir. I estimated the land had been enhanced by deposits of gravel that would be commercial."

An then on cross-examination this witness testified as follows:

"Q. Mr. Brown, you put the highest and best use on the land as grazing and enhanced by gravel deposits?

A. Farming and grazing and enhanced by gravel deposits.

Q. How much did you put on the gravel deposits?

A. I didn't put any separate—I used what the market would pay.

Q. Does this highest and best use apply to the entire 409 acres?

A. Yes, sir.

Q. It applies to the full 409?

A. That is what I—The market would pay for it."

On cross-examination this witness continued:

"Q. One final question, sir, on your, I believe the difference you testified to as just compensation was $30,365, is that correct?

A. That is correct.

Q. That is correct?

A. Yes, sir.

Q. And you say that you have not, you do not have a separate breakdown of that land which

is suitable for grazing and that land which is suitable for gravel mines?

A.  No, sir. I did not break it down. The market wouldn't break it down. They buy it as one tract."

Mr. Benjamin Clardy, a geologist, testified as to extensive gravel deposits on the land involved. He testified that he would estimate from the walls he saw in the gravel pits that the deposits would run from six to eight feet deep, and that he would not be surprised if they would not reach a depth of 10 feet in some places. He testified that he had no idea how much gravel was in the 409 acres; that he knows there are several gravel deposits in the area, but that it would be presumptuous on his part to attempt to testify to the extent of any of them.

Mr. Charles Scott, a highway department appraiser, testified that in his opinion the highest and best use of the land was for cattle grazing. He testified that the market value of the entire tract was $51,500 or approximately $126 per acre prior to the taking, and that in his opinion the fair market value after the taking is $42,750 or approximately $114 per acre, leaving a difference of $8,750 as damages and just compensation for the taking. Mr. Scott also based his opinion on comparable land sales in the area ranging from $76.50 per acre to $191 per acre including improvements.

The court instructed the jury (without objections) as follows:

"The existence of gravel deposits on the condemned land is an element which you may take into consideration, but only to the degree that it influences the fair market value of the land."

As to the Commission's first point, we are of the opinion that there was sufficient evidence of a market for gravel to justify the court in allowing testimony as to gravel deposits on the subject land.

As to the Commission's second point, we are of the opinion that the trial court did not err in its refusal to strike the value testimony of Charles Wilburn and P. M. Brown. Both of these witnesses testified that the highest and best use of the land was for cattle grazing, but that the market value was enhanced by gravel deposits. Both witnesses testified that they took the gravel deposits into consideration in arriving at their opinion as to the market value, but both witnesses were unable to separate the values attributable to the highest and best use as farm and grazing land from the value as enhanced by the gravel deposits. There is no evidence in the record that the taking of the right-of-way disturbed the gravel deposit on the land at all.

When a part of an owner's tract of land is taken by eminent domain in this state, the rule is well settled that his just compensation is measured by the difference in the value of the land, when put to its highest and best use, immediately prior to the taking and immediately after the taking. *Ark. State Highway Comm'n v. Fox,* 230 Ark. 287, 322 S. W. 2d 81; *Ark. State Highway Comm'n v. Maus,* 245 Ark. 357, 432 S. W. 2d 478. Apparently the only intent and effect of the evidence in this case pertaining to gravel at all, was simply to show that this entire tract of land would bring a higher price per acre on the open market, both before and after the taking, because it contained gravel of commercial value.

The appellant-Commission cites and relies on statements in 4 Nichols on Eminent Domain, 1970 Cumulative Supplement, pages 61 and 217, as follows:

"Where different segments of a parcel are susceptible of valuation on the basis of differing highest and best uses, it is error to attribute an overall or average unit of value to the entire parcel.

While valuable mineral deposits on condemned land constitute an element of damages to be considered, if the development of such deposits is in-

consistent with the highest and best use upon the basis of which the land is valued, such deposits may not be considered."

We do not agree with the Commission that Wilburn and Brown based their market valuation on two inconsistent highest and best uses. In fact, they refused to do so. They both clearly attributed the highest and best use as a cattle ranch or pasture land, and testified that it was more valuable per acre, on the market, because it contained gravel. No one testified that any one segment of the land involved in this case was susceptible of valuation for gravel mining purposes. Its highest and best use was for cow pasture land and there is no evidence that its value enhancement by its gravel content was any less after the taking than it was before.

By fair market value is meant the amount of money which a purchaser who is willing but not obligated to buy the property would pay to an owner who is willing but not obligated to sell it, taking into consideration *all uses* to which the land is adapted and might in reason be applied. *Little Rock Junction Ry.* v. *Woodruff*, 49 Ark. 381, 5 S. W. 792.

In 4 Nichols on Eminent Domain, 3rd ed., at page 402, § 13.2, is found the following:

"When a tract of land taken by eminent domain contains ore, stone, coal, sand, gravel, peat, loam, oil, gas or other valuable deposits constituting part of the realty, the existence of these features can be taken into consideration in determining the compensation so far as they affect the market value of the land. The same rule would be applicable where the land is covered with growing crops or trees capable of being converted into lumber. But even in such case, the market value of the land as land remains the test. Hence, there can be no recovery for any of the foregoing elements valued separately as saleable items additional to the value of the land."

The "before and after" value rule only applies in condemnation cases where the owner is claiming severance damage, or damage to the remainder. Where there is no claim for severance damage, the owner's compensation for the land condemned is the market value thereof at the time of the taking for all purposes. *Lazenby* v. *Ark. State Highway Comm'n,* 231 Ark. 601, 331 S. W. 2d 705.

In arriving at the before and after value, of land in condemnation proceedings, the owner is entitled to compensation based on the market value of the land put to its highest and best use, but he is not required to confine his evidence to only the highest and best use to which the land is adapted. He may offer evidence of all purposes, comprehending its availability for any use for which it is plainly adapted as well as its most valuable purpose for which it can be used and will bring most in the market. *Scott* v. *State,* 230 Ark. 766, 326 S. W. 2d 812; *Desha* v. *Independence County Bridge District No. 1,* 176 Ark. 253, 3 S. W. 2d 969; *Rinke* v. *Union Special School District No. 19,* 174 Ark. 59, 294 S. W. 410; *Weidemeyer* v. *Little Rock,* 157 Ark. 5, 247 S. W. 62; *Drainage District No. 11* v. *Stacey,* 127 Ark. 549, 192 S. W. 904.

In 1 Orgel on Valuation Under Eminent Domain, 2d Ed., § 30, is found the following:

> "A properly qualified witness may express an opinion that the property has a 'fair market value' of $10,000, and he may explain, both on direct and on cross examination, the particular qualities of the property which lead him to conclude that it is worth this amount. But he is not ordinarily permitted to testify that the property 'has a value of $10,000 for building lot purposes' or 'for the best use.' "

Property has but one market value, not one value for one use and another for another. *Napa* v. *Navoni,* 56 Cal. App. 2d 289, 132 P. 2d 566 (1942). And as was said by the California District Court of appeal in *Joint*

*Highway Dist. No. 9* v. *Ocean Shore R. Co.,* 128 Cal. App. 743, 18 P. 2d 413 at p. 417:

> "This market value may be greater or less than the value in use to either the owner or the condemnor, but in the eyes of the law it is a fixed amount determined by 'the highest sum which the property is worth to persons generally, purchasing in the open market in consideration of the land's adaptability for any proven use.' "

In the case at bar neither Wilburn nor Brown attempted to place a value on the land for farm and cattle grazing as distinguished from a different value for gravel production. They both simply testified that the highest and best use of the land would be for a cattle operation, but that its value was enhanced by the fact that it had gravel deposits that would be considered by a purchaser in the open market. They both testified that the difference in the before and after market value was caused by the diminished access to that portion of the land east of the right-of-way.

The verdict of the jury was well within the difference in market value as testified to by Wilburn and Brown, and we conclude that the judgment of the trial court rendered on the verdict should be affirmed.

The judgment is affirmed.